[Cite as *State v. Rosa*, 2013-Ohio-5867.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 12 MA 60 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| JOHN ROSA, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |


CHARACTER OF PROCEEDINGS:      Criminal Appeal from County Court
                               No. 2, Case No. 11 CRB 2


JUDGMENT:                      Reversed and Conviction Vacated.


APPEARANCES:
For Plaintiff-Appellee:        Attorney Paul J. Gains
                               Prosecuting Attorney
                               Attorney Ralph M. Rivera
                               Assistant Prosecuting Attorney
                               21 W. Boardman St., 6th Floor
                               Youngstown, OH  44503


For Defendant-Appellant:       Attorney Edward Czopur
                               42 North Phelps Street
                               Youngstown, OH  44503


JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Cheryl L. Waite


                               Dated:  December 19, 2013

DeGenaro, P.J.

{¶1} Defendant-Appellant John Rosa appeals the March 6, 2012 judgment of the Boardman County Court No. 2, convicting him of one count of misdemeanor domestic violence and sentencing him accordingly. On appeal, Rosa asserts his conviction was not supported by sufficient evidence and/or against the manifest weight of the evidence in light of his claim that his actions constituted reasonable parental discipline under the circumstances.

{¶2} A threshold issue of first impression in this district is whether unreasonable parental discipline is a component of the physical harm element of R.C. 2919.25(A), or is reasonable parental discipline an affirmative defense. The lone Supreme Court case on the subject, *State v. Suchomski*, 58 Ohio St.3d 74, 567 N.E.2d 1304 (1991), allocates the burden of proving the unlawfulness of parental discipline on the state as an element of the offense. However, the fact pattern, coupled with the limited analysis in *Suchomski*, make application of the holding difficult. As a result, the appellate districts that have addressed the issue are spilt on a resolution, and we urge the Ohio Supreme Court to take up the issue to provide much needed guidance, because the distinction has ramifications at trial and on appeal regarding the burden of proof and appealable issues.

{¶3} That said, we hold that proof of unreasonable parental discipline is part of the analysis of the physical harm element, with the state bearing the burden of proof. Thus, in such cases, the state must prove that the parental discipline was improper and unreasonable, based upon the totality of the circumstances. This is the better approach given the unique circumstances of the parent/child relationship, specifically a parent's fundamental constitutional right to child-rearing, which includes a right to impose reasonable discipline, including the use of corporal punishment. This dynamic is absent in other relationships that are protected by R.C. 2919.25(A)'s prohibition of domestic violence between family or household members.

{¶4} Turning to the merits, we must determine whether the evidence is sufficient to support Rosa's conviction; and if so, then whether his conviction is against the manifest weight of the evidence. To reiterate, we are considering these arguments from the perspective that the unreasonableness of Rosa's discipline is an element of the offense

the State must prove. In viewing the evidence in the light most favorable to the State, we conclude that no rational fact-finder could find Rosa's actions in disciplining his son were improper and unreasonable and thus his conviction is not supported by sufficient evidence. Rosa's second assignment of error, concerning manifest weight, is moot based upon our resolution of the first assignment of error. Accordingly, the judgment of the trial court is reversed and Rosa's conviction is vacated.

## Facts and Procedural History

{¶5} On January 3, 2011, Rosa was charged by complaint with one count of domestic violence (R.C. 2919.25(A)), which arose out of an incident involving his minor son, JR. Rosa was arraigned, pled not guilty and waived his speedy trial rights. He was released on bond, one condition of which was that he have no contact with JR.

{¶6} The matter proceeded to a bench trial on March 6, 2012, where the following evidence was adduced.

{¶7} During the evening hours of December 30, 2010, JR and his younger siblings, NR and GR, were spending time with Rosa at his apartment. At the time, JR was 12; NR was 9; and GR was 11.

{¶8} JR testified that NR and GR were playing video games, and Rosa was watching television. JR stated that Rosa was "drinking a lot of alcohol," at the time. JR stated that Rosa became upset and grabbed him by his neck and pulled him from the living room to his bedroom. JR explained: "He [Rosa] was watching TV, and like he got mad. And he like grabbed me by the neck and like tossed me - - like pulled me from the living room to my bedroom and just shut the door and like walked away." JR stated that Rosa had his hands around his neck when he grabbed him and that it hurt. He said he did not think he did anything to deserve that kind of treatment.

{¶9} After he was in his room, JR put his bed against the door and exited the apartment through a bedroom window so he could "contact [his] mom" and "get help." JR walked around the apartment complex until he found someone who let him borrow a cell phone so he could "dial 911 to have an officer come over and call or text [his] mom and have her come and get me."

{¶10} On cross, JR admitted that before Rosa grabbed him by the neck, JR and

NR were hitting each other with pillows, and playing with nerf guns. JR admitted that after Rosa placed him in the bedroom Rosa occasionally came in and checked on him to make sure he was okay. JR said he decided to leave through a window because he was afraid of Rosa and worried Rosa might harm him again. Although JR did not require any medical attention for his neck after the incident, he claimed to have bruises for about two weeks after the incident. No photographs of his injuries were offered or admitted into evidence.

**{¶11}** JR also confirmed on cross that he had been diagnosed with Defiance Disorder, suffers from mood swings and has anger issues. He takes medication and receives counseling for the disorder. JR agreed he does not take orders or instructions from adults very well, stating: "it's like if I was asked to, I would do it. But if you treat me like poo, I'm not going to do something for you." When asked whether he often failed to listen to his father when told to do things he responded that if he was asked "politely" he would do it, but that if his father yelled at him, or asked him in a "mean" way to do something he would not have complied.

**{¶12}** The following dialogue occurred regarding JR's behavioral responses to certain situations:

> Q. What if you didn't think you did anything wrong and someone yelled at you to go to your bedroom. Would you listen to them, or would you tell them I didn't do anything wrong and argue with them?
> A. I would just – I wouldn't argue with them. I would just say I didn't - - I don't think I did anything wrong.
> Q. And then you wouldn't go because you didn't do anything wrong, correct?
> A. Yes.
> * * *
> Q. And if you really did do something wrong, even though you didn't think [you did], and maybe the other kids are in danger, the only way to stop that would be to physically take you to your bedroom, right.
> A. Yes.

{¶13} Boardman Township police officer Jonathan Martin testified he was on patrol and was called to Rosa's apartment complex. Officer Martin arrived with another patrolman and spoke to JR who was 12 years old at the time. He said JR was "distraught. He seemed to be crying and upset. And we noticed that he had some red discoloration to his neck area, a scratch, and a little bit of dried blood."

{¶14} While the officers were talking to JR, Rosa came out of his apartment and approached them in the parking lot. Rosa appeared upset and when asked what happened inside the apartment, he advised them he did not want to talk about it. On cross, Officer Martin testified that he did not question JR's siblings about what happened. He confirmed JR told him that just prior to the incident with his father JR was having a nerf gun fight with his siblings.

{¶15} Rosa testified in his defense. On the evening in question he had the children in his custody for several more days than usual because their mother had to work and then was unreachable for several days after that. The children were playing with nerf guns in Rosa's apartment and JR became upset when the other two "double-teamed" him, causing JR to put the nerf guns away. The other children then started playing video games and JR hit his 11-year-old sister, GR, in the face with a plastic bowling ball. Rosa gave JR a time-out in his room and started cooking dinner. JR came out, found the bowling ball and hit his sister with it again. Rosa sent JR to his room a second time.

{¶16} JR got out of his room a third time and all three children started fighting, smacking each other in the hallway. Rosa broke up the fight by putting JR in his room and sent the other two children to time-outs on different couches. Rosa said that JR was being disruptive while in his room: "screaming, hollering and yelling." He went to check on JR a few times over the next half-hour period. Rosa subsequently learned from his nine-year-old son NR that JR was missing. Assuming at first that JR was hiding, Rosa looked throughout the apartment and when he could not find him, called 911. Then Rosa went out in the parking lot, saw JR and the two officers, and was arrested.

{¶17} On cross, Rosa testified that he could not recall whether he was drinking alcohol that evening. Further, he did not recall: telling officers that he gave JR the option

of either grounding or corporal punishment; stating that he had swatted JR two times on the behind; or telling police that he had no explanation for the injury to JR's neck.

{¶18} The defense rested and the parties presented closing arguments. Defense counsel argued that Rosa's conduct constituted reasonable parental discipline under the circumstances. The prosecutor asserted that grabbing a child by the neck with sufficient force to cause bruising was excessive and constituted domestic violence under Ohio law.

{¶19} The trial court found Rosa guilty of domestic violence and sentenced Rosa to a 180 day jail sentence with 173 days suspended and 12 months of community control. The trial court also referred Rosa to a state-certified facility for anger management and alcohol assessments and ordered that Rosa have "no contact with [JR] that could result in new charges filed." The trial court granted Rosa's motion for stay pending appeal.

### The Standard in Parental Discipline Cases

{¶20} As a threshold matter, we must resolve an issue of first impression in this district: whether unreasonable parental discipline is a component of the physical harm element of a domestic violence charge pursuant to R.C. 2919.25(A) that the state must prove, or whether reasonable parental discipline is an affirmative defense that the defendant-parent must prove. Making this choice has distinct ramifications at trial and on appeal. If the nature of the parent's discipline is an element of the offense, then the state's burden of proof is beyond a reasonable doubt. Alternatively, if it is an affirmative defense, the defendant-parent bears the burden of proof, albeit the lower preponderance of the evidence standard. Moreover, if parental discipline is an affirmative defense then a sufficiency review on appeal would be improper. *See State v. Davis*, 7th Dist. No. 01 JE 18, 2002-Ohio-1566, ¶8. By definition, an affirmative defense "is not merely a denial or contradiction of evidence offered by the state to prove the essential elements of the crime charged, but rather is the admission of prohibited conduct coupled with claims that surrounding facts or circumstances justify the conduct." *Id.* at ¶8 (discussing the affirmative defense of self-defense).

{¶21} The unique nature of the parent/child relationship, including the parent's right to discipline their child, including the use of corporal punishment, underscores the importance of clarifying the law in this district. "Parents are responsible for the

upbringing, education and discipline of their children, as parents have a fundamental liberty interest in the care, custody and management of a child." *State v. Ivey,* 98 Ohio App.3d 249, 258, 648 N.E.2d 519, 526 (8th Dist.1994), citing *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1171 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Yet, these considerations are not accounted for in the domestic violence statute, R.C. 2919.25(A) or the assault statute, R.C. 2903.13(A). Both statutes provide that "no person shall knowingly cause or attempt to cause physical harm." The assault statute, R.C. 2903.13(A) identifies the victim as "another or to another's unborn," whereas the domestic violence statute identifies the victim as "a family or household member." Importantly, a child of a defendant would qualify as a victim under both statutes, and physical harm is defined "*any* injury, illness, or other physiological impairment, *regardless of its gravity or duration*." R.C. 2901.01(A)(3) (emphasis added).

**{¶22}** The lone Supreme Court case on the subject of parental discipline in the context of domestic violence cases, *State v. Suchomski*, 58 Ohio St.3d 74, 567 N.E.2d 1304 (1991), allocates the burden of proving the unlawfulness of parental discipline on the state as an element of the offense. In *Suchomski,* a defendant-parent was charged with domestic violence against his child, in violation of R.C. 2919.25(A), and moved to dismiss the indictment for failure to sufficiently charge a criminal offense. The facts as laid out by the state in its brief in opposition to the motion to dismiss allege Suchomski was intoxicated, pulled an eight-year-old child out of bed while he was asleep, punched the child in the stomach and pounded his head into a wall, bloodying the child's lip and causing his wife to grab the underdressed child and flee to a neighbor's house. *Id.* at 75.

**{¶23}** Suchomski argued that being charged under this domestic violence statute "effectively prohibit[ed] him from using corporal punishment to discipline [that] child." *Id.* He further argued that he could not be prosecuted for domestic violence because the General Assembly recognized the right of a parent to inflict corporal punishment when it adopted R.C. 2919.22, the child endangering statute, which provides:

> (B) No person shall do any of the following to a child under eighteen

years of age * * *:

(3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child[.]

*Id.* at 75, fn. 1.

{¶24} The trial court dismissed the indictment, the court of appeals affirmed. Rejecting Suchomski's argument that there was a conflict between the domestic violence and the child endangering statutes, the Supreme Court stated the following proposition of law:

Nothing in R.C. 2919.25(A) prevents a parent from properly disciplining his or her child. The only prohibition is that a parent may not cause "physical harm" as that term is defined in R.C. 2901.01(C). "Physical harm" is defined as "any injury[.]" "Injury" is defined in Black's Law Dictionary (6 Ed.1990) 785, as " * * * [t]he invasion of any *legally protected interest* of another." A child does not have any legally protected interest which is invaded by proper and reasonable parental discipline.

*Id.* at 75 (emphasis added by the Supreme Court).

{¶25} The Supreme Court then reviewed Suchomski's alleged conduct against the above standard and concluded it was sufficient to meet the elements of a domestic violence charge pursuant to R.C. 2919.25(A) and reinstated the indictment against Suchomski. In other words, the allegations supported a conclusion that the defendant-parent had exceeded the bounds of reasonable and proper parental discipline by inflicting injury to such an extent that he violated his child's interest to be protected from an assault; the conduct was abuse, not corporal punishment.

{¶26} However, the fact pattern coupled with the limited analysis makes application of the holding difficult. The Court gave no guidance as to what would be

corporal punishment that would not rise to the level of physical harm as contemplated by R.C. 2919.25 and *Suchomski,* where the family or household member victim was the child of the offender. As a result, in parental discipline cases some appellate districts have treated the issue as an element of the offense with the state bearing the burden of proof[1] while others have deemed it an affirmative defense with the parent-defendant bearing the burden of proof[2]. Regardless of the approach chosen, the resolution of these cases is highly fact-specific.

**{¶27}** The affirmative defense analysis was adopted by the Tenth District in *State v. Hicks*, 88 Ohio App.3d 515, 518-520, 624 N.E.2d 332 (10th Dist.1993). In *Hicks*, the defendant-parent was convicted of domestic violence stemming from an incident where she slapped her eight-year-old daughter eight times on the back, causing bruising. *Hicks* at 518-519. One of the assigned errors was erroneous jury instructions, which partially tracked the language in the *Suchomski* case:

> " * * * [Y]ou are also instructed to know that a parent has a right to discipline her child. Now, nothing in the domestic violence section that I read to you— nothing in the domestic violence offense prevents a parent from properly disciplining her child. The only prohibition is that a parent may not cause physical harm, as that is defined. And, again, I define for you physical harm, which means any injury or illness to another, regardless of its quantity or duration."

---

[1] *State v. Adaranijo*, 153 Ohio App.3d 266, 2003-Ohio-3822, 792 N.E.2d 1138, ¶8 (1st Dist.) (recasting assignment of error in parental discipline case as one concerning sufficiency); *State v. Hoover*, 5 Ohio App.3d 207, 450 N.E.2d 710 (6th Dist.1982) (a pre-*Hicks*, pre-*Suchomski* case concluding corporal punishment by a school administrator is derivative of the parental privilege.) *See also State v. McNichols*, 4th Dist. No. 02CA11, 2002-Ohio-6253 (applying sufficiency analysis, and reviewing the totality of the circumstances concluded that the evidence supported conviction in light of unreasonable parental discipline); *Brooklyn v. Perna*, 8th Dist. No. 96647, 2012-Ohio-265 (evidence insufficient to support conviction for domestic violence).

[2] *State v. Thompson*, 2d Dist. No. 04CA30, 2006-Ohio-582, ¶33; *State v. Luke*, 3d Dist. No. No. 14–10–26, 2011-Ohio-4330, ¶21; *State v. Cantwell*, 5th Dist No. 2007 CA 00062, 2008-Ohio-3928, ¶36; *State v. Hicks*, 88 Ohio App.3d 515, 518-520, 624 N.E.2d 332 (10th Dist.1993); *State v. Vandergriff*, 11th Dist. No. 99-A-0075, 2001 WL 1117182, *3-4 (Sept. 21, 2001); *State v. Zielinski*, 12th Dist. No. CA2010–12–121, 2011-Ohio-6535, ¶25.

*Hicks* at 519.

**{¶28}** Notably, the language from *Suchomski* defining injury as an invasion of a legally protected interest was omitted. The Tenth District held the jury charge was erroneous, acknowledging the problem applying *Suchomski:* "We cannot fault the trial court for following this wording of the Supreme Court of Ohio. However, the facts in the *Suchomski* case did not lend themselves to a careful analysis or finely crafted definition of the limits of "proper and reasonable parental discipline." *Hicks* at 519. Accordingly, the court adopted an affirmative defense analysis for claims of reasonable parental discipline in domestic violence cases.

**{¶29}** However, there are constitutional problems with this approach:

Although the Ohio Supreme Court in Suchomski ruled that "nothing in [Ohio Revised Code] 2919.25(A) prevents a parent from properly disciplining his or her child," the Court declined to elaborate on the scope of what is permissible. Subsequent appellate court cases, such as Hicks have served only to aggravate the uncertainty about the scope of the domestic violence statute's prohibition against parental discipline. Instead of addressing the constitutional issues, both the Suchomski court and Hicks and its progeny skirted the issues--solely addressing statutory and common law issues. The result of Hicks was adherence to a strict affirmative defense approach that defied legal precedent, common sense, and hundreds of years of Anglo-Saxon jurisprudence. Under the current interpretation of the element of "physical harm," the prosecution need only prove de minimis physical contact to make its prima facie case and survive a motion for judgment of acquittal. Corporal discipline, by definition, involves conduct on the part of a parent that would constitute domestic violence in the absence of a legally recognized privilege or constitutional right. Therefore, under Hicks, the real issue in every parental corporal discipline case is *whether the accused parent has proven his or her innocence because, by its definition, virtually every incident of parental*

*corporal discipline will meet the prima facie elements of Ohio's domestic violence statute. This burden-shifting approach may be acceptable in a straightforward affirmative defense analysis, but it impermissibly chills the exercise of a fundamental constitutional right.*

> \* \* \*

*The Hicks decision also created sub-constitutional problems. The decision was at odds with the Ohio Supreme Court's decision in Suchomski, the common law, and pre-existing appellate court decisions.*

(Footnotes omitted.) Richard Garner, *Fundamentally Speaking: Application of Ohio's Domestic Violence Laws in Parental Discipline Cases - - A Parental Perspective*, 30 U.Tol.L.Rev. 1, 17-19 (1998) (emphasis added).

**{¶30}** The element of the offense analysis was adopted by the First District in *State v. Adaranijo*, 153 Ohio App.3d 266, 2003-Ohio-3822, 792 N.E.2d 1138, ¶8 (1st Dist.), where the defendant-parent asserted that his domestic violence conviction involving his daughter was against the manifest weight of the evidence. The court "recast his assignment of error \* \* \* to reflect what it believe[d] to be the more fundamental issue underlying this case: whether Adaranijo's conviction was supported by sufficient evidence." *Adaranijo* at ¶8.[3]

**{¶31}** The First District emphasized the constitutional dimension of the issue, citing *Suchomski* and noting that "[a] parent has a fundamental liberty interest in raising and controlling his or her children. 'Indeed, that parental right is among those inalienable rights secured by natural law which Article I, Section 1 of the Ohio Constitution was intended to protect from infringement by the police power of the state.'" *Adaranijo* at ¶11. The court balanced this constitutional right against the state's legitimate interest in protecting children from harm, concluding domestic violence laws can apply between parent and child in severe cases. *Id.*

---

[3] Although the court later referred to parental discipline as an affirmative defense, it was inconsistent with the court's analysis of the issue, and should be construed as a misstatement, since affirmative defenses by definition are not subject to sufficiency review on appeal. *See Davis, supra*, 7th Dist. No. 01 JE 18, 2002-Ohio-1566, ¶8.

**{¶32}** The split among our sister districts is understandable given the lack of context for the holding in *Suchomski,* and we urge the Ohio Supreme Court to take up the issue. However, we must decline to adopt the affirmative defense rationale. Placing the burden on the parent creates a very real constitutional problem because, in essence, the parent is forced to prove his or her innocence when corporal discipline is used:

> "[P]arents have the right of restraint over their children and the duty of correcting and punishing them for misbehavior." *In re Schuerman*, 74 Ohio App.3d 528, 531 (3d Dist .1991). Parents have the right to use reasonable physical discipline, or corporal punishment, to prevent and punish a child's misconduct. *State v. Hauenstein*, 121 Ohio App.3d 511, 516 (3d Dist.1997) citing *State v. Suchomski*, 58 Ohio St.3d 74, 75 (1991); *In re J.L.*, 2008–Ohio–1488, at ¶ 12; *In re Luke*, 3d Dist. No. 14–10–26, 2011–Ohio–4330, ¶ 21. The right of parents to administer reasonable corporal punishment is deeply rooted in the history and traditions of this nation. *In re J.L.*, 2008–Ohio–1488, at ¶ 12, citing *State v. Hoover*, 5 Ohio App.3d 207, 211 (6th Dist.1982), quoting *Quinn v. Nolan*, 7 Dec.Rep. 585, 586 (1879) ("From the time of Solomon to the present, parents have had the right, in a proper manner and to a proper degree, of inflicting corporal punishment upon their heir children * * *."). *See also* 1 Blackstone, COMMENTARIES, RIGHTS OF PERSONS, CHAPTER 16: OF PARENT AND CHILD, Section 2 (under the common law, parents may correct an underage child in a reasonable manner).

*In re S.S.*, 3d Dist. Nos. 8–12–06, 8–12–07, 8–12–08, 2013-Ohio-747, ¶17.

**{¶33}** Our conclusion that the unreasonableness of the parent's discipline is an element the state must prove in domestic violence cases is bolstered by principles of statutory construction, as prescribed by the Revised Code. Specifically, R.C. 1.51 provides: "If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions

is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail."

**{¶34}** There is a specific child endangering statute that prohibits parents from using excessive corporal punishment. R.C. 2919.22(B)(3) (quoted at Opinion ¶23, *supra*). Under this statute, the state bears the burden of proving that excessive corporal punishment was administered by the parent. *Id.* In order to reconcile the general domestic violence statute, R.C. 2919.25(A), with the more specific child endangering statute, R.C. 2919.22(B)(3), the burden of proof should remain with the state to prove unreasonable corporal punishment when the charge is brought against a parent under the domestic violence statute. Having this consistency will avoid the problem of the state using the domestic violence statute to avoid meeting part of its burden of proof in a situation that involves potential excessive or unreasonable corporal punishment by a parent.

**{¶35}** Accordingly, we hold that the State bears the burden of proving that a defendant-parent's conduct caused an injury to the child that invaded the legally protected interest of the child. A child does not have any legally protected interest against proper and reasonable parental discipline. *Suchomski.* Thus, in parental discipline cases, the State must prove that the parent's conduct was improper and unreasonable corporal punishment in light of the totality of the circumstances.

**{¶36}** With that framework in mind, we turn to the assigned errors.

### Sufficiency

**{¶37}** In his first of two assignments of error, Rosa asserts:

**{¶38}** "Appellant's conviction was based on insufficient evidence as the evidence at trial does not constitute a criminal offense in light of parental discipline."

**{¶39}** A challenge to the sufficiency of the evidence tests whether the state has properly discharged its burden to produce competent, probative, evidence on each element of the offense charged." *State v. Petefish*, 7th Dist. No. 10 MA 78, 2011-Ohio-6367, ¶16. Thus, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a

verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).

**{¶40}** Rosa was convicted of one count of domestic violence, which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(A). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "Family or household member" includes "a child of the offender[.]" R.C. 2919.25(F)(1)(a)(iii). Physical harm is defined, as inter alia, "any injury * * * regardless of its gravity or duration." R.C. 2901.01(A)(3). Citing Black's Law Dictionary 785 (6th Ed.1990), the Ohio Supreme Court defined "injury" as " * * * [t]he invasion of any *legally protected interest of another.*" (Emphasis sic.) *Suchomski* at 75. "A child does not have any legally protected interest which is invaded by proper and reasonable parental discipline." *Id.*

**{¶41}** Thus, in parental discipline cases the state must prove that the defendant's administration of corporal discipline was improper and unreasonable in light of all of the surrounding facts and circumstances. *See Perna*, 8th Dist. No. 96647, 2012-Ohio-265, ¶15; *Adaranijo*, 153 Ohio App.3d 266, ¶14. When considering whether under the totality of the circumstances the physical harm element has been proven by the state, factors to be considered in parental discipline cases "(1) the child's age; (2) the child's behavior leading up to the discipline; (3) the child's response to prior non-corporal punishment; (4) the location and severity of the punishment; and (5) the parent's state of mind while administering the punishment." *Luke, supra*, 3d Dist. No. 2011-Ohio-4330, ¶23; *State v. Hart*, 110 Ohio App.3d 250, 255-56, 673 N.E.2d 992, (3d Dist.1996) ("The propriety and reasonableness of corporal punishment in each case must be judged in light of the totality of the circumstances.")

**{¶42}** Several domestic violence cases involving parental discipline where courts have reversed on sufficiency grounds further instruct our analysis. For example, in *State*

*v. Wagster*, 1st Dist. No. C-950584, 1996 WL 134538, (Mar. 27, 1996) the First District reversed and vacated the appellant's conviction under the following facts:

> On April 2, 1995, twelve-year-old Kera was spending the weekend at the home of appellant, her natural father, and her stepmother. Kera became angry when her stepmother insisted that the audio tapes that Kera was recording on the tape player be put away in alphabetical order. Kera "stomped" up the stairs, went into her sister's room, and slammed the door. Kera began to scream at her sister about her stepmother. When appellant heard the commotion he went upstairs to talk to Kera, who screamed at him. Kera's sister testified that Kera was out of control. Appellant slapped Kera with the back of his hand in order to calm her down so that she would stop screaming. Kera's sister stated that appellant did not take a full swing at Kera, but rather used the tips of his fingers from short range. After appellant left the room, Kera discovered that the skin under her inner lip had lodged between two crooked teeth. The skin broke as Kera dislodged it and she experienced minimal bleeding. Her sister absorbed the blood in a wet towel. Shortly thereafter, Kera went downstairs and sat on appellant's lap. They made up and everyone proceeded to eat dinner. Kera did not complain of any injury, nor did she mention the bleeding or request any medical attention. After dinner, Kera's stepmother drove her to her natural mother's home without incident. Kera did not complain about any injury. Kera testified that her lip later turned blue and was swollen for about two days, but there was no necessity to seek medical attention.

*Wagster* at *1.

**{¶43}** In *Perna*, the Eighth District summarized the pertinent facts as follows:

> [T]he record reflects that the child was being disciplined by her father for back-talking. Although the City elicited testimony from J.P. [the 13 year-old daughter] that Perna threw J.P. down on the couch three to four times,

and covered his daughter's mouth with his hands, all parties admit that J.P. suffered no bruises or lasting injuries. Additionally, Perna argued that he warned his daughter that her continued poor behavior would result in discipline and she chose to ignore him. Perna further argued that he acted only out of an attempt to control his out-of-control teenage daughter. J.P. suffered a soft-tissue injury and wore an ace bandage on and off for two weeks after the incident; however, there was no evidence of substantial harm to the child.

*Perna*, 8th Dist. No. 96647, 2012-Ohio-265 at ¶6.

**{¶44}** Based on those facts the court concluded that while it did "not condone the use of excessive punishment against any child, the conduct of Perna did not rise to that level. Thus, in view of the facts and circumstances in this case, we find there was insufficient evidence for any rational trier of fact to conclude Perna's actions were other than proper and reasonable. Upon our review, we find the evidence was insufficient to convict Perna of domestic violence." *Id.* at ¶17.

**{¶45}** There are similarities between this case and both *Wagster* and *Perna*. In those cases, as here, the teen or nearly teenaged child sustained slight injury when the father was trying to control or stop the bad behavior. Although JR testified that Rosa was drinking that evening, there is no police testimony that Rosa was intoxicated. And although JR at first claimed he did nothing to provoke the incident, on cross he conceded that he had been fighting with his siblings. Significantly, he admitted he had issues with anger, defiance, mood swings, and taking direction from authority figures, and conceded that in situations where he did not believe he was in the wrong, physical force would be required to put him in his room.

**{¶46}** This is consistent with Rosa's testimony and supports Rosa's need to use physical force to put JR in his room after verbally directing JR to his room in two prior attempts to stop the fighting between the children. Those prior efforts failed because JR left his room and began fighting with his siblings again. In a reasonable attempt to stop JR's behavior and separate him from the other children, Rosa grabbed JR by the neck

and placed him in his room, causing very minimal injury: "some red discoloration to [the] neck area, a scratch, and a little bit of dried blood." It is undisputed that Rosa continued to check on JR after putting him in his room the third time and JR did not leave the room through a window until later. In addition, JR's testimony indicated that he left Rosa's apartment with the ultimate goal of contacting his mother, who had been unreachable for several days according to Rosa, to come get him.

**{¶47}** Application of the factors articulated in *Luke* and *Hart* supports reversal here: 1), JR was 12 year at the time; 2) his behavior leading up to the discipline included hitting his 11-year-old sister in the face with a plastic ball twice and then physically fighting with her and their 9-year-old brother; 3) JR did not change his behavior after being sent to his room twice; (4) Rosa physically grabbed JR to separate him from the physical fight with his younger siblings and putting him in his bedroom; and finally 5) Rosa had to take physical action to separate the children as prior non-corporal efforts failed, and he checked on JR after putting him in his bedroom after the third incident between the children. *Luke* at ¶23; *Hart* at 255-56.

**{¶48}** Viewing the evidence in the light most favorable to the State, Rosa's conduct was neither improper nor unreasonable given the totality of the circumstances: his actions fell within the bounds of reasonable parental discipline. Accordingly, we conclude his conviction was not supported by sufficient evidence; Rosa's first assignment of error is meritorious.

## Manifest Weight

**{¶49}** In his second and final assignment of error, Rosa asserts:

**{¶50}** "Appellant's conviction was against the manifest weight of the evidence pursuant to the affirmative defense of parental discipline thereby requiring reversal."

**{¶51}** Based on our resolution of the first assignment of error, the second assignment of error is moot and we decline to address it. App.R. 12(A)(1)(c).

## Conclusion

**{¶52}** Resolving a threshold issue of first impression in this district, we hold that in order to convict a parent of domestic violence pursuant to R.C. 2919.25, as part of the "physical harm" element, the State bears the burden of proving the parent's discipline was

improper and unreasonable given the circumstances. This is the better approach given the unique circumstances of the parent/child relationship; specifically the fundamental constitutional right of child-rearing, which includes the parent's right to discipline their child, including the use of reasonable corporal punishment. Placing the burden on the parent to prove the reasonableness of his or her discipline runs contrary to the Supreme Court of Ohio's *Suchomski* case and presents potential constitutional problems.

{¶53} Applying that law to the present case, we conclude that Rosa's conviction is not supported by sufficient evidence; State has failed to prove that Rosa's discipline was improper or unreasonable given the totality of the circumstances. Accordingly, the judgment of the trial court is reversed and Rosa's conviction is vacated.

Donofrio, J., concurs.

Waite, J., concurs.