[Cite as *State v. Royster*, 2015-Ohio-3608.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 25870 |
| | : | |
| v. | : | T.C. NO. 12CR1272 |
| | : | |
| JOSEPH A. ROYSTER | : | (Criminal appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the __4th__ day of __September__, 2015.

. . . . . . . . . . .

ANDREW T. FRENCH, Atty, Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ROBERT L. MUES, Atty. Reg. No. 0017449 and CHARLES W. MORRISON, Atty. Reg. No. 0084368, 1105 Wilmington Avenue, Dayton, Ohio 45420
        Attorneys for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Joseph Royster, filed August 19, 2013. Royster was convicted, on August 20, 2013, following a jury trial, on two counts of rape of a child under ten years of age, in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree, and one count of endangering children

(corporal punishment), in violation of R.C. 2919.22(B)(3), a felony of the third degree. The trial court dismissed a third count of rape after Royster made a Crim.R. 29 motion for acquittal at the close of the State's case. Royster received concurrent sentences of 15 years to life on the rape counts, and 36 months on the endangering children offense, for an aggregate sentence of 15 years to life.[1] Royster was also designated a Tier 3 sex offender. The victim herein, J.J., who was born in July, 2002, is the daughter of Royster's girlfriend.

{¶ 2} On December 23, 2013, appointed counsel for Royster filed an appellate brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), alleging that no arguably meritorious issues existed for appeal. On March 24, 2014, Royster filed a pro se brief. On October 3, 2014, this Court determined that potentially meritorious issues did exist for purposes of appeal, namely whether there was sufficient evidence to sustain a conviction for child endangerment, whether there was sufficient evidence of penile penetration to sustain the rape conviction on count two, and whether Royster's convictions of rape and child endangerment are against the manifest weight of the evidence. This Court appointed new counsel to analyze these issues as well as any additional assignments of error recognized after a thorough review of the entire record.

{¶ 3} The following evidence was adduced at trial. Terry Stevenson testified that she is a "registered play therapist" at the Mental Health Clinic in Troy, and that she began treating J.J. around August of 2012. She stated that she sees J.J. "about once a month," and that she has seen her 15 times. Stevenson stated that she and J.J. were "working

---

[1] The record reflects that in the course of plea negotiations, the State offered an agreed sentence of ten years, which Royster rejected.

on sexual abuse to help her work through it. She was having nightmares. She was having flashbacks. * * * She couldn't sleep, she was so afraid. * * * She's just really been trying to work through all those feelings so that she doesn't have to be in constant fear." Stevenson stated that J.J. at one time "had thought about hanging herself." Stevenson stated that she has worked with sexually abused children most of her career, and that J.J.'s behavior and symptoms are "very consistent" with those of other children who have disclosed sexual abuse. Stevenson testified that J.J. told her that Royster told her that he would have to leave their home if she disclosed the abuse to anyone.

{¶ 4} Stevenson stated that J.J. also disclosed an episode of sexual abuse involving two young boys. On cross-examination, Stevenson stated that J.J. disclosed the incident in January, 2013, and that the boys were 11 and 12 years old. The following exchange occurred:

Q. And you said she was fairly graphic with that? She called it a tower? They formed a tower?

A. Yes.

Q. * * * And she was bent over the bed when one boy had his penis inserted into her anus. Is that correct?

A. Yes. Yes.

Q. And I think the other boy was inserting his penis into the other boy's anus. Is that correct?

A. I believe so.

{¶ 5} Lori Vavul-Roediger testified that she is a pediatrician employed at Dayton Children's Hospital as the medical director for the Department of Child Advocacy. She

stated that she is board certified in general pediatrics as well as in child abuse pediatrics, and the court designated Vavul-Roediger an expert in those areas. Vavul-Roediger testified that she examined J.J. on April 17, 2012, and that she spoke with J.J.'s maternal grandmother, J.B., with whom J.J. resided. According to Vavul-Roediger, J.J. "spontaneously," and not in response to questioning, told her in the course of her examination that she does not like to wear dresses and expose her legs because of scarring there. She stated that J.J. told her that one scar on her left knee was from falling down, and when asked about visible linear scaring on her right thigh, she "sort of shrugged and said, I don't know, and didn't respond otherwise." Vavul-Roediger stated that she was concerned about the linear scarring due to the "patterned nature of the scarring on her legs in that I was worried that they may not be accidental in nature based on their characteristics, their pattern, their placement on her leg. They didn't seem to be a typical location nor a type of injury that would typically result from routine activity in an active child." Vavul-Roediger testified that she asked J.J. "if she had ever been hurt by anyone," and that J.J. "looked down and said, my mom's boyfriend hit me with a belt * * * and the buckle on my legs." Vavul-Roediger testified that she asked J.J. "if she had any specific marks on her legs that could have been caused by being hit with a belt or buckle. She said, I don't know, he just hit me on my legs." Vavul-Roediger stated that she has observed scars on children inflicted by a belt in her experience, and she acknowledged that there could be a substantial risk of scarring if a child were beaten with a belt.

{¶ 6} Vavul-Roediger testified that she asked J.J. if Royster hurt her in any other way, and she testified as follows:

> * * * And she was quiet and said, yes. I asked her if it was hard to

talk about and she said, yes. I asked [J.J.] if she could show where on her body she had been hurt by Joseph and she put her hand over her genital area and said, my privates.

I asked her if she could explain what had happened to her privates and she said, I don't want to tell you with all these people in the room and referenced the nurse and a training medical student who was in the room with me. So we asked those parties to be excused from the room * * * and they exited. And her Grandmother remained behind at [J.J.'s] request. Grandmother made no comment during this entire time and sat silently on the chair.

And I asked her, at this time, if she would be willing and would like to tell me what had happened and she said yes, now that the other folks had left the room.

Q. Was she able to tell you, at that point, or did you do some other activities with her first?

A. I asked nothing else and she began to talk.

Q. What did she tell you?

A. [J.J.] said, Joseph touched me on my privates. He put his private in my private. And I asked her did anything else happen, thinking that she might be able to report something general in terms of any other type of contact. And she said he had a plastic bag on his private. And I clarified with her * * * what she meant because I was rather surprised. And she, again clarified that Joseph had a plastic bag on his private when he

had put his private in her private.

And I asked her what it felt like to her body when Joseph put his private in her private, and [J.J.] said it hurt, it hurt to pee after. I asked her if anything else happened and [J.J.] said, he put his finger in my private; he went like this - - inside my private. And she motioned with her finger in the air in circles, demonstrating that. And she continued to talk and said, his nail is long and when I peed, it hurt. * * *

I asked her if Joseph told her anything about what happened and [J.J.] said, he told me not to tell. And I asked her if Joseph had, by chance, told her what would happen if she told. And [J.J.] said, he said he would get in trouble with my mom and she would not date him anymore. I asked her if anyone else besides Joseph had ever touched her or hurt her privates in any way and [J.J.] said no.

We talked about who she could talk to if she was worried or scared, and she said, my grandma. * * *

{¶ 7} Vavul-Roediger testified that after talking with J.J., she performed a physical and genital exam. She stated that "there was one area on [J.J.'s] hymen that had what we call a notch or an area where there was essentially a depression, sort of a U-shaped scooped out depression." According to Vavul-Roediger, "the notch was noted to sort of, what we call persist or stay in two different exam positions," namely a "supine position on the back," and "in what we call a prone or knee-chest position." Vavul-Roediger noted that she had not examined J.J. prior to the alleged sexual abuse, and that she did not know if "this notch was something that was previously there or not."

She stated that the notch, by itself, is "essentially, diagnostically, something of indeterminate significance." The following exchange occurred:

Q. Did [J.J.] express any other symptoms to you, like having problems falling asleep at night or anything of concern for her safety or anything like that?

A. There * * * were several other issues. She has been - - or had, rather, been complaining, I guess of stomachaches that her care provider felt was due to her anxiety and feeling nervous. She had reportedly had a decline in her academic performance for several months. Had been perceived by her care provider as being very anxious and clingy. Having difficulty sleeping, wanting to sleep with her primary care provider.

Reporting that she would constantly check household doors and windows to make sure that they were locked. Very fearful that her biological mother would return to take her back to the home setting where the alleged perpetrator resided. And said that she was also very fearful and worried about other parties coming, you know, to understand. Like I'm assuming school and other family and friends to learn what had happened to her. * * *

So she was having a great deal of anxiety and a lot of symptoms of * * * hyper-vigilance. * * * So lots of concerns for, * * * possible post-traumatic type symptoms as well.

Q. And, again, in and of themselves, those symptoms can't say for sure abuse happened but are they supportive of a disclosure, clear

disclosure of abuse?

A. The symptoms, themselves, if someone said I have a child who is clingy and anxious and can't sleep and checks windows. I'm not going to go, oh. Well, that's a child who's sexually abused, by no means. But clearly, when you look at the constellation of everything that this little child has, unfortunately, and that you understand what is most clear and paramount, that she's giving a very, very clear disclosure of being sexually abused. Yes, her symptoms are supportive of what she reports has occurred to her.

Q. * * * Doctor, * * * you're not here to give an expert opinion on the truthfulness of what the child's saying?

A. No, I'm not here to say that whatsoever. I'm saying that she clearly reports being sexually maltreated. Her symptoms clearly are supportive of what she reports.

Finally, Vavul-Roediger testified that the linear scarring on J.J.'s legs "could be" consistent with being hit with a belt.

{¶ 8} On cross-examination, Vavul-Roediger testified that according to the history provided by J.J.'s grandmother, J.J. resided in the same home with Royster from 2010 to the spring of 2011, when she then resided with her grandmother. When asked if she herself had observed any of the behaviors indicative of J.J.'s anxiety as reported by J.J. and her grandmother, Vavul-Roediger replied that she observed that J.J. "was anxious, she was fearful, she was emotionally distraught. She was afraid. Plain and simple. This was not an easy thing for her just to disclose. And it was clear that this little girl was

very, very afraid when sharing what she shared with me about this man." Vavul-Roediger testified that she understood the word "private" to refer to J.J.'s vagina, "because she had previously put her hand over her genital area and called it her private." Vavul-Roediger stated that someone who has not been sexually abused could have a hymeneal notch. She stated that J.J. "had a notch that was a deep notch at 7 to 8 o'clock, which is a particular area on her hymen. This deep notch that was there, it is not acute, meaning it's not a fresh notch, * * * there was no bleeding or bruising associated with it. I can't tell you how long that notch has been there. * * *." She further clarified that she "can't tell you the specific reason the notch is there. I can tell you it's an indeterminate finding that could be supportive of this child's disclosure, of digital-vaginal penetration and penile-vaginal penetration. It is not a normal exam." Regarding the scars on J.J.'s right thigh, Vavul-Roediger stated that there were two separate, hyperpigmented scars next to each other that were about a centimeter-and-a-half in length. On redirect, Vavul-Roediger stated that the "majority of patients we see, as this child was seen, days, weeks, months, perhaps longer, after an alleged incident or incidents of sexual abuse have normal exams."

{¶ 9} J.J.'s grandmother, J.B., testified that J.J. and her little brother came to live with her in April of 2011, after J.J.'s mother dropped them off at her home. J.B. testified that she observed that J.J "was little quieter and she didn't play with my other granddaughter as much as she used to." According to J.B., one Sunday she "was in the washing room and [J.J.] came out and she was crying in the kitchen, sitting in a chair, just balled up in a chair. And I kept asking her what was wrong and she would never say anything because she was crying real hard, and then, finally, she told me, Joe." J.B.

stated that J.J. did not tell her details of what had happened but that she gradually, over time, disclosed the abuse. J.B. stated that in the first week of March, 2012, she contacted the Piqua police based upon J.J.'s disclosure. J.B. stated that she was present when J.J. provided information to the police about Royster, and that she later took J.J. to speak to officers in Dayton, and to Care House. She stated that in January, 2013, J.J. disclosed further abuse by other people. When asked if she was upset with J.J. for not telling her about the additional abuse, J.B. agreed and responded, "I thought she would tell me most of anything that happened, but she didn't tell me about that. But she said she didn't want to tell me. I think [J.J.] figured that I had heard enough." J.B. stated that J.J. has upset stomachs, that she did not want to come to court, is "clingy" and has trouble sleeping. She stated that J.J. "always makes sure the door is locked."

{¶ 10} Officer Paula Craft of the Piqua Police Department testified that on March 2, 2012, she responded to J.B.'s home, and that after meeting with her, she advised J.B. to bring J.J. to the Piqua police station in Miami County the following day. After talking to J.J. on the following day, Craft testified that she realized that the offenses alleged by her to have occurred took place on Salem Avenue in Dayton and Montgomery County, and that she advised J.B. to take J.J. to speak to an officer in that jurisdiction.

{¶ 11} J.J. testified that she is 11 years old and lives with J.B., her brother, and two cousins. She stated that when she was eight years old, she lived with her mother in Troy, and that she later moved to Linda Vista Avenue in Dayton and attended a local public school. J.J. stated that Royster resided with her, her brother, and her mother at the Linda Vista address. J.J. stated that her mother worked at night until the early morning hours, and that she and her brother stayed home with Royster. J.J. testified that on one

occasion, Royster asked her to come into the room he shared with J.J.'s mother, while her mother was at work, and that he "told me to pull my underwear down. Then he told me. He put his hands on my private parts." The following exchange occurred:

Q. * * * So you're in that room. He asked you to take down your underwear. And then what happened?

A. He put his fingers in my private.

Q. * * * Now a lot of people use different terms for different body parts. Can you - -

A. My front private.

Q. * * *Can you point to the jury where it is?

(Inaudible response)

Q. * * * And when you say inside your private, how did you know it was on the inside?

A. I could feel it.

Q. How did it feel?

A. It hurt.

Q. * * * Is there any reason if you know, why it hurt? Was there anything about the Defendant's fingers that - -

A. He had long fingernails.

Q. * * * After that happened did it continue to hurt afterwards?

A. Yes.

Q. What about when you went to the bathroom?

A. Yes. When I went to school too.

Q. * * * Now when he did that to you was that the only time he's ever touched you or were there any other times he touched you?

A. One more time.

Q. * * * Was that in the same apartment or somewhere else?

A. Same apartment.

Q. And when he touched you the second time where did that happen? * * *

* * *

A. His bedroom.

Q. * * * Did he have his clothes on or off when he touched you?

A. Off.

Q. And what part of his body touched what - -

A. His private part in the front.

* * *

Q. And what did it touch for you?

A. My private part in the front.

Q. * * * And when he touched you was - -   did you feel it skin on skin or was there anything in between?

A. Skin on skin.

Q. * * * Was there anything on his private part?

A. A plastic bag.

* * *

A. A bag, plastic sandwich bag.

Q. * * *Did you see where he got that?

A. Off my mom's dresser.

Q. Did he put that on before he touched you or after he touched you?

A. Before he touched me.

Q. * * * Now when he touched you with his penis did it touch just - - well, did it go all the way in, a little bit in, or not in at all?

A. A little bit in.

Q. * * * I want you to look at this tissue box. If this is on the outside and this is all the way in, can you show like how it went in?

A. About that much.

Q. * * * So it went in just a little bit?

A. Yes.

Q. * * * What happened when it went in just a little bit? Did it hurt?

A. I can - - I don't know.

Q. * * * Well, what happened?

A. It went in just a little bit, but then he told me it wouldn't work.

* * *

Q. * * * How old were you when these things happened? Were you eight or - -

A. Eight.

* * *

A. Eight or nine.

Q. * * * When you were still eight years old did you go live with your grandma in April of 2011?

A. Yes.

Q. * * * Did the Defendant ever say anything to you about whether you should talk about this?

A. He said * * * if you tell your mom about it, she will break up with him.

* * *

Q. With regard to the Defendant, did he ever discipline you if you got in trouble?

A. Yes.

Q. What would he discipline you with?

A. A belt.

Q. And when he hit you with a belt what part of your body would he hit?

A. My butt.

Q. * * * Did he ever hit you on your legs?

A. A little bit sometimes.

Q. * * * Did that ever leave any marks that you remember?

A. Like weps (sic)?

* * *

Q. Like welts?

A. Yeah.

{¶ 12}  J.J. testified that she did not tell J.B. about the abuse until February of 2012.  J.J. testified that after the instant case began, she advised the prosecutor that while she was still living with her mother and brother, after Royster had abused her, that other boys, who were the sons of one of her mother's friend, abused her.  According to J.J., "[t]here were two little boys there and they were my mom's friend's son.  And * * * we were in this house and we were playing a video game.  * * *  He took me inside of his room with his friend and they tried - - and the little boy tried to make me put my mouth on his private part, but I didn't want to. And then the other two boys tried to put their private parts into my butt."  J.J. stated that she was nine years old when this occurred, and that the other boys were around her age.  J.J. further testified about another incident involving a 14 year old boy that occurred while she resided with her mom and Royster.  She stated that she was in someone's basement and the boy "said I had to put my mouth over his private part to play" video games.  J.J. testified that Royster found out about the incident with the 14 year old boy, and that Royster "said my private part was his."  J.J. identified photographs of the apartment where she resided on Linda Vista Avenue.  J.J. stated that she has been in therapy since she was ten years old, and that she discusses her feelings there.  When asked how she feels about Royster, she replied, "I don't like him and he scares me."

{¶ 13}  On cross-examination, J.J. was asked if she told Officer Craft that Royster abused her at an address on Salem Avenue, and J.J. indicated that she did not remember.  J.J. acknowledged that she never lived on Salem Avenue in Dayton.  The following exchange occurred:

Q.   Now you talked about Joe using a belt and I believe sometimes

would use it on your - - he used it on your butt and sometimes on your legs, is that right?

A. Yes.

Q. Do you remember where on your legs?

* * *

Q. On the tops or the bottom, like - -

A. The top.

Q. * * * And you said that it would sometimes, you would have a welt?

A. Yes.

Q. * * * do you still have any of those welts?

A. No.

Q. So any of the marks that the belt caused went away?

A. Yes.

{¶ 14} J.J. testified that she was interviewed by Detective Richard Taylor of the Dayton Police Department at Care House twice, and she testified that she told Taylor in the first interview that no one else besides Royster had touched her inappropriately, and she testified that that was not the truth. J.J. stated that the other two incidents that she described in her direct testimony with the young boys occurred while she resided with her mother, brother and Royster. She stated that she did not discuss the incidents with her mother, and that she did not know how Royster found out about the incident involving the 14 year old boy. J.J. stated that in her second interview with Taylor, which occurred after she had reported the incidents involving the boys to the prosecutor, she told Taylor that

the two boys wanted her to do something "nasty", and that one of the boys placed his penis against her "butt," but that it did not go inside. J.J. denied telling Stephenson that the boy's penis did go inside her "butt." J.J. acknowledged that she told Vavul-Roediger that no one besides Royster touched her inappropriately, and that that was incorrect.

{¶ 15} Detective Taylor testified that in March, 2012, he was assigned to the "special victims unit with a specialty at Care House." He stated that the instant matter was referred to the Dayton Police Department from Miami County Children's Services by means of a "TRU," or telephone reporting unit, "and that's generally kind of a low priority call" because the alleged victim is not in immediate danger. When the instant case was assigned to Taylor, he testified that he contacted the Miami County Children's Services caseworker and scheduled a forensic interview for J.J. at Care House. Taylor stated that he is trained to conduct a forensic interview with a child victim in a manner that encourages the child "to tell you what happened in their words and narrate freely." Taylor stated that children are "highly suggestible," and that "[w]e try to ask open ended questions. You do your best not to ask a yes or no questions. (sic) If you do have to ask a yes or no question * * * if their answer is yes, you say, 'Well, tell me about that.' You know, you don't want to direct them. You just try to stay neutral * * * and get them to tell you what happened in their own words."

{¶ 16} In the course of his interview with J.J., Taylor stated that she used terminology beyond her years that concerned him. He stated that J.J. "talked about when [Royster] put her (sic) finger in her. * * * I asked her how she knew it was inside and she described that it hurt and then talked about - - described his fingernails as being very long and it caused her pain." Taylor stated that when J.J. disclosed the second incident,

"she talks about that the Defendant was naked and put a plastic sandwich bag on his private * * * initially when she's telling me this and I'm thinking she's describing a condom. But she was very adamant that, no, this was a plastic sandwich bag that like you would pack your school lunch in." According to Taylor, that is "not something - - that's just not normal. It's just not something normal you would hear coming from - - I believe she was ten years old at the time, telling me." The following exchange occurred:

Q. And now when you say not normal, like she shouldn't have that advanced knowledge or that –

A. Yes. In my opinion - -

Q. Well, don't give us your opinion.

A. Oh, I'm sorry. I'm sorry.

Q. But that's when you say it caused you concern. In other words, I guess what I'm trying to make sure I understand. When you say, gave you pause or caused you concern, it wasn't you were worried or were you worried that somebody had been coaching her or was it you were concerned, or gave you pause, because this is the type of thing, you know, unless you've experienced it would be hard to make up?

A. Well, I would say, yes, I was definitely - - I was worried that - - that gave me concern that this did not seem like something that would be made up. It just seemed very odd, something that almost you had to experience. And it also, you know, I've been around kids that have been coached and I've interviewed those kids. And usually the details, when the details are much more, you know, it would be maybe, for example, he put a condom

on, not a plastic sandwich bag.   So that's what concerned me.

**{¶ 17}**   The following exchange occurred regarding the location of the offenses:

Q. * * * Did you get any sense of or was [J.J.] able to give you any description of the place she lived?

A.   She did.

Q.   * * * And is that area, Linda Vista Avenue, where is that in relation to Salem Avenue?

A.   Linda Vista is approximately one block off of Salem Avenue.

* * *

Q.   * * * At some point after the interview did you actually go out to try and corroborate her story about where she lived or investigate where it might be?

A.   I did.

Q.   And do you remember where you went?

A.   * * * once the interview was done with what information I had, suspect information, I looked up through a couple of databases that are available to us and found the address of * * * Linda Vista that the suspect had used, one in either a State of Ohio database provided by the attorney general's office which uses driver's license, motor vehicle registration, that type of public stuff.   And he had used * * * Linda Vista, Apartment * * *. Also * * * I found a traffic ticket that Mr. Royster had received where he had also carried the address of Linda Vista, Apartment * * *.

Taylor stated that he went to the Linda Vista address and spoke to a woman who

indicated she had resided there since November, 2011, and who confirmed that she had received mail there addressed to J.J.'s mother. Taylor identified photographs taken by him of the apartment on April 11, 2012.

{¶ 18} Regarding the incident with the 14 year old boy, the following exchange occurred:

Q. When you interviewed [J.J.] a second time about some of these other incidents, trying to follow up on with the other boys, did she give you kind of a disclosure at that point of what she said happened?

A. With those boys, yes, she did.

Q. Did she ever mention whether Joe had said anything to her?

A. She did tell me about a comment that Joe had made to her.

Q. What'd she say?

A. * * * she had told me about the second incident with the 14 year old in the basement. She said that after that Joe had found out somewhere. And she told me they had been out and they'd gotten like some candy and food and this was later and Joe was having a talk with her about that and told her that "Nobody is to touch your parts, your private parts, because those are mine."

{¶ 19} On cross-examination, Taylor testified that in his first interview with J.J., she told him that no one else touched her inappropriately, and that he did not learn of the subsequent two incidents for almost a year, in late January or early February of 2013.

{¶ 20} On redirect examination, the following exchange occurred:

Q. Detective, this is probably my fault, so I apologize, but we kept using

red flag and concern and could mean you pause for seems like lots of different categories of things. So I want to bring it back to that, just to clarify.

* * *

Q. Was there anything [J.J.] said to you during her interview that caused you a concern that she was lying to you, either being coached or whatever?

A. No.

Q. Obviously you weren't there, so you don't know whether, you can't vouch for that she's saying the truth, but I just mean in terms of when you talk about a red flag for things she said there was nothing that was like, oh, that's because either she's being coached or lying?

A. No. At no time did I think that.

* * *

{¶ 21} We note that Royster filed a petition for post-conviction relief on March 3, 2014, which the trial court overruled on August 25, 2014. This Court affirmed the decision of the trial court in *State v. Royster*, 2d Dist. Montgomery No. 26378, 2015-Ohio-625. Royster, acting pro se, sought reconsideration of that decision, and this Court granted his application for the purpose of considering Royster's argument that his counsel failed to investigate a more specific timeframe for the offenses. *State v. Royster*, 2d Dist. Montgomery No. 26378 (April 7, 2015). Thereafter, this Court affirmed our prior decision. *Id.*

{¶ 22} Royster asserts four assignments of error herein[2]. His first assigned error

---

[2]We note that portions of Royster's brief are single-spaced. App.R. 19(A) governs the form of briefs and provides that briefs shall be double-spaced "except quoted matter which shall be single spaced."

is as follows:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S CRIM.R. 29 MOTION FOR A[C]QUITTAL WITH RESPECT TO THE PENILE RAPE AND CHILD ENDANGERING OFFENSES, AS THE STATE FAILED TO PRODUCE SUFFICIENT EVIDENCE TO PROVE EACH ESSENTIAL ELEMENT OF THE OFFENSES BEYOND A REASONABLE DOUBT.

A. The State Failed to Produce Sufficient Evidence that the Appellant's Use of Corporal Punishment was "Excessive under the Circumstances," and That It Created A "Substantial Risk of Serious Physical Harm," as Required by R.C. 2919.22(B)(3).

B. The State Failed to Produce Sufficient Evidence That Vaginal Penetration Occurred as Required Under R.C. 2907.02(A)(1)(b).

**{¶ 23}** As this Court has previously noted:

When reviewing the denial of a Crim.R. 29(A) motion, an appellate court applies the same standard as is used to review a claim based on the sufficiency of the evidence. "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009–Ohio–525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N .E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State,

could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

*State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 28.

**{¶ 24}** Royster directs our attention to *Bowman v. Bowman,* 9th Dist. Medina No. 13CA0064-M, 2014-Ohio-2851, in which the Ninth District affirmed the grant of a civil protection order in favor of a mother and against the father where "a rational finder of fact could have found that [father's] use of corporal punishment was 'excessive under the circumstance and create[d] a substantial risk of serious physical harm * * *.' " *Id.,* ¶ 18. The father in *Bowman* slapped his eleven year old daughter "in the face with enough force to knock her to the ground, leave a handprint the following day, and cause her lip to swell because she would not hand over her iPod." *Id.* The Ninth District held that when "determining whether corporal punishment was excessive, a trial court must consider the totality of the circumstances, 'including the age of the child, the child's response to non[-] corporal punishment, and the behavior being punished.' * * *." *Id.,* ¶ 11.

**{¶ 25}** Royster also relies upon *State v. Rosa*, 6 N.E.3d 57, 2013-Ohio-5867 (7th Dist.), which held that the evidence was insufficient to support a father's conviction for domestic violence. The *Rosa* court noted that, "[i]n a reasonable attempt to stop [the son's] behavior and separate him from the other children, [the father] grabbed [his son] by the neck and placed him in his room, causing very minimal injury * * *." *Id.,* ¶ 46. The *Rosa* court also determined that in "parental discipline cases, the State must prove that the

parent's conduct was improper and unreasonable corporal punishment in light of the totality of the circumstances."[3]  *Id.,* ¶ 35.

{¶ 26} Royster further asserts as follows:

> No pictures of these marks were ever introduced into evidence, nor were they published to the jury.   Outside of J.J.'s testimony that appellant used a belt on her legs "a little bit sometimes" that temporarily left welts, the state produced no evidence that any punishment administered was "excessive under the circumstances."   Simply put, there were no details of where or when the incident(s) occurred, no discussion of the circumstances leading up to the punishment, no discussion of whether non-corporal punishment methods had failed in the past, and no evidence of what occurred afterwards (i.e. whether medical treatment was sought, whether or not J.J. experienced any pain, etc.).   Therefore, the jury had absolutely no circumstances to consider when assessing the charge.   The record affirmatively demonstrates that the state failed to produce sufficient evidence that appellant's use of corporal punishment was "excessive under the circumstances."   Therefore, the evidence produced at trial is insufficient to uphold a guilty verdict as a matter of law and the conviction

---

[3] *See State v. Thompson*, 2d Dist. Miami No. 04CA30, 2006-Ohio-582, ¶ 33 ("The trial court concluded that Defendant's conduct in striking his stepdaughter's hand with [a] metal object was not appropriate as a means of physical punishment and was extreme and excessive under the circumstances, and therefore, was not proper and reasonable parental discipline. Under the totality of these facts and circumstances, we conclude that the trial court acted well within its discretion in reaching its decision. Having failed to prove *that affirmative defense*, Defendant was properly found guilty of domestic violence.") (emphasis added).

should be reversed.

**{¶ 27}** The State responds in part as follows:

* * * In Royster's mind, since the jury did not hear evidence regarding the circumstances under which he beat J.J. -  such as what J.J. did to deserve the beating or how J.J. had responded in the past to other, less severe forms of punishment – the evidence was insufficient to show that the beating he inflicted here was "excessive."   Royster's argument appears to assume that beating an eight-year-old with a belt so severely that it leaves welts and permanent scarring might be appropriate under some circumstances and that, therefore, evidence is sufficient to support a charge of endangering children only if the trier of fact is aware of the totality of the circumstances under which the beating occurred.   * * *

**{¶ 28}**   R.C. 2919.22 provides:

* * *

(B) No person shall do any of the following to a child under eighteen years of age * * *

* * *

(3) Administer corporal punishment * * * which punishment * * * is excessive under the circumstances and creates a substantial risk of serious physical harm to the child.

**{¶ 29}**   Pursuant to R.C. 2901.01(A)(5), and as the jury was instructed, serious physical harm to persons means in relevant part:

(a) Any mental illness or condition of such gravity as would normally

require hospitalization or prolonged psychiatric treatment;

* * *

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 30} Having reviewed the evidence in a light most favorable to the State, we conclude that a rational finder of fact could have found the essential elements of endangering children proven beyond a reasonable doubt. J.J. testified on direct and cross that if she got into trouble, Royster would discipline her by means of a belt, and that the belt and buckle left welts on her legs and buttocks. J.J. went to live with J.B. in April of 2011, and at the time of Vavul-Roediger's physical examination of J.J. one year later, in April, 2012, according to the doctor, visible scarring on her left knee and right thigh were present. Vavul Roediger testified that J.J. told her that the scar on her knee was caused by a fall, but when asked about the scarring on her right thigh, J.J. was reluctant to respond. Only after Vavul-Roediger asked her if someone had harmed her did J.J. disclose that Royster beat her with a belt and buckle. The jury was free to attribute J.J.'s initial reluctance to incriminate Royster both to her overwhelming fear of him and her concern that others would learn what he did to her. This conclusion is supported by Vavul-Roediger's testimony that J.J. spontaneously told her that she did not like to wear dresses because doing so exposed the scars on her legs. Further, based upon her training and experience, Vavul-Roediger expressed concern that the scars on J.J.'s thigh

"may not be accidental in nature based on their characteristics, their pattern, their placement on her leg." According to Vavul-Roediger, the scarring "did not seem to be a typical location for a type of injury that would typically result from routine activity in an active child." While she could not definitively state that the scarring was caused by a belt and buckle, Vavul-Roediger testified that the marks could be consistent with being beaten by a belt, and that being beaten with a belt could cause scarring, or, in other words, serious physical harm.

{¶ 31} Finally, we conclude that Royster's reliance upon *Bowman* and *Rosa* is misplaced for the proposition that in the absence of evidence regarding the totality of the circumstances surrounding Royster's endangering children offense, Royster was entitled to an acquittal. We note that the *Rosa* Court noted "the unique nature of the parent/child relationship, including the parent's right to discipline their child, including the use of corporal punishment," and as the State asserts, the matter herein is not a parental discipline case. *Id.*, ¶ 21. If the jury believed J.J.'s testimony that Royster beat her with a belt and buckle to such an extent that welts remained visible on her skin, and credited Vavul-Roediger's testimony regarding the nature and pattern of the scarring as inconsistent with a typical childhood injury, the jury could have found the essential elements of R.C. 2919.22(B)(3) proven beyond a reasonable doubt.

{¶ 32} Regarding Royster's assertion that the State failed to produce sufficient evidence of penile penetration, Royster asserts in part that "J.J.'s testimony is confusing as she is unclear regarding the specifics of what happened and is even unsure whether it hurt. * * * J.J. initially stated that she felt appellant, 'skin on skin,' but later said he covered his penis with a plastic bag he retrieved off the dresser." Royster asserts that there "is no

evidence that appellant was actually trying to push inside of her vagina and there was no evidence whether J.J. even experienced any pain as she so explicitly detailed in regards to the alleged digital penetration. The details of the account here are extremely vague and unclear and thus, do not prove beyond a reasonable doubt that penetration occurred." Royster directs our attention to *State v. Wells*, 91 Ohio St.3d 32, 740 N.E.2d 1097 (2001), in which the Ohio Supreme Court affirmed the decision of this Court that reversed the defendant's conviction for anal rape after finding that the State failed to prove penetration into the victim's anal cavity. The *Wells* Court held as follows:

[T]here is sufficient evidence of anal intercourse, for purposes of the crime of anal rape under R.C. 2907.02, where the trier of fact finds that the defendant penetrated, however slightly, the victim's anus with any part of the defendant's body, or with any instrument, apparatus, or other object. If the evidence shows that the defendant made contact only with the victim's buttocks, there is not sufficient evidence to prove the defendant guilty of the crime of anal rape. As a corollary, where the evidence shows that the defendant attempts to penetrate the victim's anus, and, for whatever reason, fails to do so and makes contact only with the buttocks, there is sufficient evidence to prove the defendant guilty of the crime of attempted anal rape.

*State v. Wells*, 91 Ohio St. 3d 32, 34, 740 N.E.2d 1097 (2001).

**{¶ 33}** Royster notes that this Court applied *Wells* in *State v. Lucas*, 2d Dist. Montgomery No. 18644, 2001 WL 1103288 (Sept. 21, 2001), which involved a charge of vaginal rape. As this Court noted in *State v. Grant*, 2d Dist. Montgomery No. 19824,

2003-Ohio-7240, ¶ 25, the evidence in *Lucas* "showed that the defendant had rubbed his penis across the victim's vaginal area. We held that, as in *Wells*, the evidence was insufficient to show penetration, and that in order to prove vaginal rape there must be evidence that the force of the object caused the labia, which form the outer lips of the victim's vagina, to spread. * * *." As noted in *Grant,* "[a]bsent that, and depending on the circumstances, only attempted vaginal rape is shown." *Id.*

{¶ 34} R.C. 2907.02(A)(1) provides: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * (b) The other person is less than thirteen years of age * * *." R.C. 2907.01(A) provides: " 'Sexual conduct' means vaginal intercourse between a male and female * * *. Penetration, however slight, is sufficient to complete vaginal * * * intercourse."

{¶ 35} We agree with the State's assertion that, if "believed, the evidence presented at trial established that Royster's penis went *into* J.J.'s vagina – not almost in or close to being in as Royster appears to suggest." In *State v. Cox*, 2d District Montgomery No. 25477, 2013-Ohio-4941, Cox was charged with penile rape, and the victim testified that Cox "tried to put his penis inside me but being so young it didn't exactly work out that way," and that he "tried" to push his penis into her vagina. *Id.*, ¶ 44. When asked if Cox's penis entered her vagina, the victim replied, "I mean a little bit but it - -I was so small as a kid, I mean I don't know. * * *. It did. It – he tried, but it didn't go in all the way." The victim acknowledged that Cox's penis "got in a little bit," and that "[i]t hurt." *Id.* This Court concluded that the victim's testimony, "if believed, is sufficient to permit the jury to reasonably conclude that Cox's conduct in inserting his penis 'a little bit' into [the victim's] vagina necessarily caused the labia majora to spread. C.F's testimony was not

confusing nor was she unsure whether Cox had penetrated her vagina with his penis." *Id.*, ¶ 45.

**{¶ 36}** We disagree with Royster that J.J.'s testimony is confusing and insufficient to support his conviction for penile rape; J.J. testified that Royster was naked at the time of the offense, and the fact that she initially stated that she felt skin to skin contact with him does not belie her assertion that he further penetrated her vagina with his penis inside a plastic bag. When questioned further, J.J. stated that Royster placed a sandwich bag on his penis and then put his penis a "little bit in" her vagina. Although the electronic recording of J.J.'s demonstration with the tissue box is not part of the record before us, we note that immediately following the demonstration, counsel for the State confirmed with her, "So it went in just a little bit," and defense counsel did not object to the State's characterization of J.J.'s demonstration.

**{¶ 37}** We note that Vavul-Roediger testified that J.J. gave "a very, very clear disclosure of being sexually abused," and that "her symptoms are supportive of what she" reported. J.J.'s testimony at trial regarding Royster's use of the plastic bag was consistent with the version of events that she related to Vavul-Roediger; Vavul-Roediger testified that J.J. "again clarified that Joseph had a plastic bag on his private *when he had put his private in her private.*" Vavul-Roediger testified that she "asked [J.J.] what it felt like to her body when Joseph put his private in her private, and [J.J.] said it hurt, it hurt to pee after," and we conclude that, given J.J.'s tender years, the fact that she was unsure at trial whether Royster hurt her in the course of the abuse does not render her version of events vague and unclear as Royster asserts. Taylor's testimony regarding J.J.'s version of events, namely that Royster was naked and put a plastic sandwich bag on his penis was

further consistent with J.J.'s trial testimony; Taylor testified that J.J. "was very adamant" about the plastic bag. Construing the evidence most strongly in favor of the State, we conclude that, if believed, the evidence against Royster would support a conviction for penile rape.

{¶ 38} For the foregoing reasons, Royster's first assigned error is overruled.

{¶ 39} Royster's second assigned error is as follows:

APPELLANT'S CONVICTIONS FOR TWO COUNTS OF RAPE ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 40} Royster asserts that "J.J. gave conflicting statements regarding how old she was when the abuse occurred," citing her testimony that she was "[e]ight or nine" at the time. Royster asserts that "J.J. told several people that she had only been abused by the appellant. However, she later indicated that there were two other incidents of abuse that occurred with different people." Royster directs our attention to J.J.'s admission that she did not tell Vavul-Roediger the truth about the other incidents of abuse, and her admission that she was dishonest with Taylor about the other incidents, and he asserts that "[t]his alone is enough to demonstrate that J.J.'s credibility is called into question as she told some people that other instances of abuse had occurred and others that it had not." Royster asserts that "J.J. was inconsistent in describing the abuse that occurred with the two younger boys," asserting that she told Taylor "that one of the boys had his penis up against her from behind," but that she told Stephenson that "the boy placed his penis *inside* her anus." Royster asserts that "J.J. made inconsistent statements regarding whether her grandmother was upset with her for not disclosing the other incidents of abuse sooner," asserting that while Stephenson testified that J.J. told her that

B.J. was upset that J.J. withheld the information, J.J. denied making the statement about her grandmother to Stephenson. Royster asserts, as he did in the first assigned error, that "J.J. gave conflicting statements in regards to the details of the penile abuse," namely that she testified that she felt skin to skin contact with Royster and then stated that he had a plastic bag on his penis. Royster asserts that "J.J. claimed the abuse took place on Salem Avenue, and then later admits she never lived there." Finally, Royster asserts that "J.J. never told anyone of the other incidents of abuse until she went to live with her grandmother. Despite that, while she was still living with the appellant, she indicated that he made a comment to her in regards to the incident with the fourteen year old boy." According to Royster, "J.J. made numerous conflicting statements, thus damaging their reliability. As a result, the jury's dependence upon them was misplaced and it is clear that they lost their way in arriving at a guilty verdict."

{¶ 41} The State responds that a review of Royster's above assertions "shows that either (1) they were not conflicting or inconsistent at all; (2) they related to collateral or inconsequential matters; or (3) they can easily be attributed to J.J.'s young age at the time of the sexual assaults * * * and the trial * * * as well as the passage of time in between." The State further asserts that even if J.J.'s testimony was inconsistent at times, she was thoroughly cross-examined by defense counsel.

{¶ 42} As this Court has previously noted:

In contrast [to a sufficiency of the evidence argument], "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." [*State v. Wilson*, 2d Dist. Montgomery No. 22581,

2009-Ohio-525], ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." [*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997)], citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

*State v. Jones*, 2d Dist. Montgomery No. 25724, 2014-Ohio-2309, ¶ 8-9.

**{¶ 43}** We initially note, as the State asserts, that a " 'conviction is not against the

manifest weight of the evidence solely because the jury heard inconsistent testimony. * * *.' " *State v. Robinson*, 2d Dist. Montgomery No. 17393, 2001 WL 62569, *9 (Jan. 26, 2001). We conclude that the jury did not lose its way simply because it chose to believe J.J.'s testimony regarding the penile rape, as set forth above, as well as her testimony that Royster put his fingers inside her "front private" in a manner that caused her ongoing pain due to his long fingernails. We note that as with the penile rape, J.J.'s trial testimony regarding the digital rape was consistent with the version of events that she related to Vavul-Roediger, and that J.J. further demonstrated Royster's conduct in committing that offense to Vavul-Roediger by motioning with her finger in circles. As noted above, Vavul-Roediger stressed that J.J. gave "a very, very clear disclosure" of the rape offenses, and that her symptoms, including her fear, anxiety, stomach aches, "possible post-traumatic type symptoms," as well as the presence of the U-shaped depression or notch on her hymen, while not conclusive proof of abuse, could be supportive of what J.J. reported. As with the penile rape, J.J.'s trial testimony was also consistent with the version of events that she related to Taylor regarding the digital rape, Royster's conduct, and his long fingernails.

{¶ 44} Finally, we agree with the State that any inconsistencies in J.J.'s testimony cited by Royster related to inconsequential matters and not to the rape offenses. Further, J.J. was testifying before a group of strangers about what Royster, whom she feared, had done to her, and minor inconsistencies in her testimony, such as her age at the time of the offenses, or whether or not her grandmother was upset that she delayed disclosing the additional abuse that did not involve Royster, are understandable. We note that J.B. testified that J.J. told her that she did not want to disclose the additional abuse to her

because J.J. "figured that I had heard enough." The jury was free to attribute J.J.'s failure to disclose the additional abuse involving the young boys to Vavul-Roediger and Taylor to the difficulty in doing so and her fear that she might get into trouble. While J.J.'s descriptions of that abuse varied in terms of whether anal penetration occurred, J.J.'s version of the events involving Royster were in fact very consistent, as discussed above. Regarding Royster's assertion that "it is unclear as to whether or not J.J. can even say for certain where she was living when the abuse was alleged to have occurred," based upon Craft's testimony that she believed that the abuse occurred on Salem Avenue, we note that J.J. identified photographs of her apartment on Linda Vista Avenue where she testified the abuse occurred, and she stated that she did not live on Salem Avenue. Finally, regarding Royster's assertion that, if J.J. "never told anyone about the other abuse that occurred until January of 2013, then it was not possible for Mr. Royster to have known, let alone comment on, the incident between August 2010 and April 2011," we note that J.J.'s trial testimony was again consistent with what she reported to Taylor in terms of Royster's comment. The identity of the 14 year old perpetrator is unknown, and the jury was free to conclude that Royster may have learned of the incident from someone other than J.J.

**{¶ 45}** Having reviewed the entire record, weighed the evidence and all reasonable inferences, we conclude that Royster's rape convictions are not against the manifest weight of the evidence. Royster' second assigned error is accordingly overruled.

**{¶ 46}** Royster's third assigned error is as follows:

APPELLANT'S TRIAL COUNSEL PROVIDED INEFFECTIVE

ASSISTANCE BY FAILING TO PURSUE AN ALIBI DEFENSE; NOT REQUESTING MORE SPECIFIC DATES IN THE BILL OF PARTICULARS; AND FAILING TO OBJECT TO THE BOLSTERING OF J.J.'S CREDIBILITY BY DETECTIVE TAYLOR.

**{¶ 47}** Royster asserts as follows:

First, counsel failed to pursue an alibi defense when evidence existed that would indisputably prove Appellant was not living in Ohio for at least two months of the time period delineated in the indictment. Second, trial counsel did not request more specific dates in the bill of particulars, and did not file a motion to compel when the state was not forthcoming with the document. Third, and perhaps most importantly, counsel failed to object to certain testimony of Detective Taylor, which effectively bolstered J.J.'s credibility. As a result, appellant's convictions should be reversed.

**{¶ 48}** As this Court has previously noted:

To reverse a conviction based on ineffective assistance of counsel, an appellant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688.

*State v. Vineyard,* 2d Dist. Montgomery No. 25854, 2014-Ohio-3846, ¶ 28.

**{¶ 49}** Regarding Royster's initial argument that his counsel was deficient in failing to pursue an alibi defense this Court previously addressed this assertion in overruling Royster's petition for post-conviction relief as follows:

* * * Royster claims his counsel was ineffective in failing to investigate his alibi that he was residing at the Carpenter Shelter in Virginia during the time frame that the rape offenses allegedly occurred. In support of the alibi argument, Royster submitted documentation from the shelter indicating that he was residing there between July 16, 2010 and October 12, 2010. Royster states in his affidavit that he had a discussion with his counsel regarding the dates of the alleged offenses and his alibi. He also averred that he provided his counsel with other supporting documentation, but that counsel did not want to use it.

Even if we were to assume counsel's performance was deficient with respect to investigating Royster's alibi, Royster has failed to establish that any further investigation would have changed the outcome of his case. As previously noted, he was indicted for committing the rape offenses sometime between August 1, 2010 and April 30, 2011. While he established an alibi between July 16, 2010 and October 12, 2010, there is still a six month window of time in which the offenses could have occurred as alleged. There was also testimony presented at trial indicating that the offenses were committed within the alleged time frame. As the trial court indicated, Royster is not alleging that he was at the homeless shelter during the entire

period between August 1, 2010 and April 30, 2011. Therefore, we agree with the trial court's finding that the homeless shelter evidence is immaterial to the outcome.

For the foregoing reasons, Royster's claim that his trial counsel was ineffective in failing to investigate his alibi has no merit.

*State v. Royster*, 2d District Montgomery No. 26378, 2015-Ohio-625, ¶ 36-38.

**{¶ 50}** Regarding Royster's assertion that his counsel was ineffective for failing to request more specific dates on which the charged conduct occurred and failing to file a motion to compel, we note that he relies upon *State v. Sellards*, 17 Ohio St.3d 169, 478 N.E.2d 781 (1985). This Court previously rejected this assertion when ruling upon Royster's application for reconsideration as follows:

In his application for reconsideration, Royster generally claims that we failed to consider [*Sellards*]. *Sellards* held that "the state must, in response to a request for a bill of particulars or demand for discovery, supply specific dates and times with regard to an alleged offense where it possesses such information." * * * *Id*. at 169. *Sellards* also explained that "inexactitude, even where the state is simply unable to comply with the times and dates more specific than those found in the indictment, *may* also prove fatal to the prosecution. Such would be the case if the absence of specifics truly prejudices the accused's ability to fairly defend himself." (Emphasis sic.) *Id*. at 172. The court in *Sellards* explained that an example of such prejudice is if " 'the defendant had been imprisoned or was indisputably elsewhere during part but not all of the intervals of time set out

in the indictment.' " *Id.*, quoting *State v. Gingell*, 7 Ohio App.3d 364, 368, 455 N.E.2d 1066 (1st Dist. 1982).

In his pro se brief, filed on October 14, 2014, Royster cited *Sellards* in support of one of his ineffective assistance of counsel claims in which he argued that his counsel was ineffective in failing to investigate * * * a more specific timeframe for the offenses alleged in the indictment. * * *

* * *

Here, Royster has not demonstrated that there is a reasonable probability that the outcome of his trial would have been different had his trial counsel investigated more specific offense dates. The trial testimony of the victim and the victim's grandmother establishes that there was not a more specific timeframe for the offense than what was alleged in the indictment. The victim testified that when she was eight years old, Royster sexually abused her inside the apartment they lived in together with her mother on Linda Vista Avenue in Dayton, Ohio. The victim testified that she turned eight on July 27, 2010. Both the victim and the victim's grandmother indicated that in April, 2011, the victim left the Linda Vista residence to live with her grandmother and has remained there since. This testimony is consistent with the timeframe of the alleged abuse in the indictment – August 1, 2010 through April 30, 2011. Therefore, no new or different information would have been obtained following any further investigation by Royster's trial counsel.

*State v. Royster*, 2d Dist. Montgomery No. 26378 (April 7, 2015).

{¶ 51} In support of Royster's assertion that defense counsel was ineffective in failing to object to Taylor's testimony, he relies upon *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989). "In *Boston*, the Supreme Court of Ohio held that an expert may not comment on the credibility or veracity of a witness. This court has stated that the rule announced in *Boston* applies to police officers as well as expert witnesses, because a juror is likely to perceive an officer as an expert and because the rule applies to lay persons as well as experts. * * *." *State v. Tobin*, 2d Dist. Greene No. 2005 CA 150, 2007-Ohio-1345, ¶ 24.

{¶ 52} In response, the State directs our attention to *State v. Stowers*, 81 Ohio St.3d 260, 262, 690 N.E.2d 881 (1998). As this Court previously noted, the " ' Ohio Supreme Court has found that testimony from a psychologist on the behavioral characteristics of sexually abused children is admissible, see [*Stowers*, at 262], and so have we. * * *.' *State v. Rosas*, 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 41." *State v. Zimpfer*, 2d Dist. Montgomery No. 26062, 2014-Ohio-4401, ¶ 30. In *Rosas*, this Court noted the "distinction 'between expert testimony that a child witness is telling the truth,' on the one hand, and on the other hand, 'evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child *has* been abused.' *Stowers*, at 262, * * *. Expert testimony is admissible as to the latter." *Rosas*, ¶ 42. As this Court determined in *Rosas*, "evidence that provides 'additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity' * ** " is admissible. *Id.*, quoting *Stowers* at 262. "Such testimony 'does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination.' [*Stowers*] at 263 * * *." *Rosas, id.*

**{¶ 53}** In reviewing Taylor's testimony, we agree with the State that Taylor permissibly testified that J.J.'s description of Royster's conduct in raping her was specific and detailed in a manner beyond her years. Also, the prosecutor cautioned Taylor not to provide his opinion and expressly noted in the course of Taylor's testimony that Taylor "can't vouch for that [J.J.'s] saying the truth." Even if we conclude that Taylor improperly testified as to his belief that J.J. was telling the truth when he stated that at "no time did I think that" J.J. had been coached or was lying, Royster cannot satisfy the second prong of the *Strickland* analysis. In other words, had defense counsel objected to Taylor's testimony, we have no basis to conclude that the outcome of the trial would have been different. This is so because, in cases involving the sexual abuse of children, "the most reliable evidence still comes from the child victim. Judges and jurors are the best fact-finders as to the credibility of witnesses and in determining guilt or innocence." *Stowers*, at 264, Resnick*, J.*, dissenting. J.J. testified and was cross-examined about what happened to her, and the jury clearly believed her testimony. We have no basis to conclude that they would not have done so had defense counsel objected to Taylor's testimony.

**{¶ 54}** Since ineffective assistance of counsel is not demonstrated, Royster's third assigned error is overruled.

**{¶ 55}** Royster's fourth assignment of error is as follows:

THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED APPELLANT OF A FAIR TRIAL AND THEREFORE, WARRANT A REVERSAL UNDER THE CUMULATIVE ERROR DOCTRINE.

**{¶ 56}** As noted by the Supreme Court of Ohio:

> *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal. *Id.* at 196–197, 509 N.E.2d 1256. * * *

*State v. Jackson*, 141 Ohio St. 3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 258.

{¶ 57} For the reasons set forth in Royster's first three assigned errors, we conclude that the record does not contain numerous, cumulative errors that deprived Royster of a fair trial.   Accordingly, his fourth assignment of error is overruled.

{¶ 58}  Having overruled Royster's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Andrew T. French
Robert L. Mues
Charles W. Morrison
Hon. Timothy N. O'Connell