[Cite as *State v. Hill*, 2025-Ohio-5500.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

CHRISTOPHER LYSHURN HILL,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 MA 0052**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2024 CR 00552

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Lynn Maro*, Mahoning County Prosecutor*, Atty. Ralph M. Rivera* and *Atty. Kristie M. Weibling*, Assistant Prosecuting Attorneys, for Plaintiff-Appellee and

*Atty. Aaron M. Meikle* for Defendant-Appellant.

Dated: December 10, 2025

**DICKEY, J.**

{¶1} Appellant, Christopher Lyshurn Hill, appeals from the May 15, 2025 judgment and the September 23, 2025 nunc pro tunc judgment of the Mahoning County Court of Common Pleas convicting him for felonious assault and endangering children and sentencing him to prison following a bench trial. On appeal, Appellant raises arguments involving sufficiency of the evidence. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} On or about May 9, 2024, Appellant physically abused I.T. ("the victim"), the 13-year-old minor child of his girlfriend and co-defendant, Maleka Darnyell Curry ("Curry"). As a result, on August 22, 2024, Appellant and Curry were secretly indicted by the Mahoning County Grand Jury on four counts: count one (applicable to Curry only), endangering children, a felony of the third degree in violation of R.C. 2919.22(A) and (E)(2)(c); count two (applicable to Appellant and Curry), felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(1) and (D)(1)(a); count three (applicable to Appellant and Curry), endangering children, a felony of the second degree in violation of R.C. 2919.22(B)(1) and (E)(2)(d); and count four, (applicable to Appellant and Curry), endangering children, a felony of the second degree in violation of R.C. 2919.22(B)(3) and (E)(3). Appellant was appointed counsel, pled not guilty at his arraignment, and waived his right to a speedy trial. Appellant later waived his right to a jury trial and elected to be tried by a trial judge.

{¶3} A bench trial was held on March 24, 2025. Numerous exhibits were admitted into evidence, including photographs depicting the serious physical injuries sustained by the victim. (State's Exhibits 1, 4-14, 16-21, 23-31, 33). Appellee, the State of Ohio, presented ten witnesses: (1) Ryan Marshburn, an officer with the Boardman Township Police Department ("Officer Marshburn"); (2) Jay Fletcher, an officer with the Youngstown Police Department ("YPD") ("Officer Fletcher"); (3) Melissa Thomas, a school nurse at East Middle School ("Nurse Thomas"); (4) Joseph Moran, an officer with the YPD ("Officer Moran"); (5) Dr. Reem Sarkis, a pediatric emergency medicine doctor at Akron Children's Hospital ("Dr. Sarkis"); (6) the victim; (7) D.T., the victim's brother; (8) Taylor Kutch, an intake supervisor with Mahoning County Children Services ("Children

Services") ("Intake Supervisor Kutch"); (9) Amanda McAllen, a nurse practitioner in the Child Advocacy Center at Akron Children's Hospital ("Nurse Practitioner McAllen"); and (10) Hannah Short, a detective in the Special Victims Unit at the YPD ("Detective Short").

{¶4}    On May 8, 2024, Officer Marshburn was dispatched to the Southern Park Mall regarding the victim, a reported juvenile runaway.  The officer located the victim in the mall, approached him, and requested his name.  The victim ran from the officer but was apprehended after a short foot chase.  Despite resistance from the victim, the officer placed him in the police cruiser.  At no time during this incident did the victim sustain any injuries.  The victim refused to provide the name of his guardian.  With the assistance of the YPD, the officer identified Curry as the victim's mother and obtained her contact information.  The officer transported the victim home and released him to Curry's custody.

{¶5}    The next day, on May 9, 2024 at approximately 11:00 p.m. to midnight, Officer Fletcher was dispatched to an apartment complex on the north side of Youngstown in reference to the victim who was considered a juvenile runaway.  Officer Fletcher and his partner, Officer Simon, located the victim at North Manor.  Prior to the arrival of law enforcement, a security guard maintained the victim at North Manor for his safety.  Officer Fletcher did not note any injuries or marks on the victim and verified that he was not complaining of any pain.

{¶6}    Officer Simon placed the victim in his cruiser.  The victim was "a little violent" and damaged the rear seat, i.e. "[j]ust moving around, kicking."  (3/24/2025 Bench Trial Tr., p. 31).  Upon arriving at Curry's home, Officers Fletcher and Simon took the victim to the door.  Officer Fletcher testified the victim was not injured or complaining of any injuries at the time he entered his home.  Curry told the officers that the victim continues to run away.  The officers informed Curry that the Juvenile Justice Center is not accepting runaways.  They recommended she seek counseling for the victim.  During this conversation, Officer Fletcher overheard Appellant "getting on [the victim's] case, trying to correct his behavior, being very loud."  (*Id.* at p. 33).  Officer Fletcher did not speak to Appellant.

{¶7}    As the officers returned to their cruisers, they heard a loud sound coming from the rear of the house.  After further investigation, they determined that the victim went out a second floor window onto the roof.  While Officers Fletcher and Simon were

present, Appellant and Curry tried to get the victim back into the house. Appellant was yelling and swearing at the victim.

{¶8} For about 45 minutes, Officers Fletcher and Simon unsuccessfully tried to convince the victim to get off the roof and go back inside the house. Officer Simon contacted his supervisor, who for another 30 minutes, attempted to coax the victim to go back inside the house. Despite the efforts of law enforcement, the victim refused to reenter the home. Assuming the victim would go back inside the home once law enforcement left, the YPD supervisor instructed Officers Fletcher and Simon to clear the scene. While law enforcement was present, the victim did not complain of any injuries, even while on the roof.

{¶9} That same morning, the victim went to East Middle School where he is a student. Leslie Kitchen, the principal, observed marks and bruises on the victim. The principal requested that Nurse Thomas examine him. The nurse completed a medical examination of the victim that included a physical examination and a discussion with him to ascertain the nature and cause of his injuries. During the physical examination, the nurse observed open and closed wounds on the victim's back, under his arms, and down his arms. Nurse Thomas testified that the wounds "[l]ooked like open flesh, like whipped." (*Id.* at p. 50). Through her discussion with the victim, the nurse determined the victim was hit with an object. To prevent infection, the nurse provided medical treatment by cleansing and applying triple antibiotic ointment and gauze to the victim's wounds. Because the victim was achy and sore from the wounds, the nurse gave him ice packs. Based upon her experience as a school nurse, Nurse Thomas has interacted with children who were victims of physical abuse. She testified that the injuries sustained by the victim in this case were "the worst [she] had seen." (*Id.* at p. 52). The nurse's medical findings were reported to the principal, the YPD, and Children Services.

{¶10} In the late morning of May 9, 2024, Officer Moran was dispatched to East Middle School because of concerns that the victim was physically abused. Upon his arrival, the officer was placed in a conference room with the principal, Nurse Thomas, and the victim. School staff advised the officer that the victim suffered injuries, in various stages of healing, to his back, shoulder, and arms. At the school, the officer was able to observe the victim's visible injuries. Because the victim required medical treatment, the

Case No. 25 MA 0052

officer accompanied the victim to Akron Children's Hospital where he was able to fully view the nature and extent of the victim's injuries. The officer described the victim's injuries as "welts, contusions, and maybe one abrasion" with "a closed-loop pattern." (*Id.* at p. 62-63). After observing the injuries, the officer did not immediately discuss their origin with the victim because he was concerned about getting him proper medical treatment. The officer notified his supervisor and Children Services.

{¶11} While Officer Moran was at the hospital with the victim, the YPD crime lab officer arrived and photographed the victim's injuries. The photographs were admitted into evidence without objection from the defense. The photographs depicted the following injuries to the victim: a raised welt; contusion of the right arm in a looped pattern; a raised welt, contusion of the right shoulder and neckline; contusions, raised welts to the left scapula and middle back with a looped pattern; a looped pattern injury to the left armpit; and looped pattern injuries to the lower left back. After the victim was treated at the hospital, he was discharged to the care of Children Services.

{¶12} Dr. Sarkis encountered the victim for the purpose of medical diagnosis and treatment. As part of the medical examination, the doctor obtained a history from the victim who reported that Appellant caused his injuries "the night prior." (*Id.* at p. 80). The doctor completed a head to toe physical examination of the victim during which she observed his injuries. The injuries were photographed and the doctor also observed the photographs as part of her examination. These photographs were admitted into evidence without objection from the defense. (State's Exhibits 6-14, 16-21, 24-31).

{¶13} Dr. Sarkis described the victim's injuries as follows: different patterns of bruising and scabs on his right arm; looped bruising with a scab on his underarm; bruising with loops on his back; patterned bruising with a scab/laceration on his shoulder or underarm; and bruising with linear injury to his left arm. The doctor testified these injuries were not caused by an open hand. Rather, the injuries were caused by someone hitting the victim repeatedly with an object. The doctor also indicated that the injuries caused the victim "significant pain." (*Id.* at p. 84). At discharge, the victim was referred to the hospital's Child Advocacy Center.

{¶14} On May 30, 2024, Nurse Practitioner McAllen encountered the victim for the purposes of medical diagnosis and treatment. As part of the medical examination, a

diagnostic interview of the victim was completed, which was observed by the nurse practitioner. The information obtained from the diagnostic interview assisted the nurse practitioner in rendering the proper diagnosis and treatment plan for the victim. During the interview, the victim revealed that Appellant hit his back and the back of his arms with an object. The victim described the injuries as "painful." (*Id.* at p. 168).

{¶15} After the interview, Nurse Practitioner McAllen completed a physical examination of the victim. She reviewed the photographs of the victim's injuries taken in the emergency department on May 9, 2024. The findings of the physical examination include that the victim had several scars located on his back and the back of his arms that were in a loop pattern as well as some dysmorphic facial features. The nurse practitioner testified that the loop patterned scars she observed on the victim's back and arms were consistent with the injuries documented in his medical records from his May 9, 2024 visit to the emergency department.

{¶16} Nurse Practitioner McAllen revealed that the injuries sustained by the victim were not caused by appropriate physical discipline. Instead, the injuries were consistent with Appellant hitting the victim with an object. These injuries caused the victim "significant pain" and were likely to result in permanent scarring. (*Id.* at p. 182). The nurse practitioner testified that the American Academy of Pediatrics established guidelines for "appropriate physical discipline" and defined it "as anything that does not leave transient -- meaning superficial redness that last longer than a couple of minutes." (*Id.* at p. 174). The nurse practitioner has experience with runaways and indicated that children often run away out of fear resulting from maltreatment. Based upon her training and experience, the nurse practitioner found that the victim's injuries were "[h]ighly concerning and consistent with child physical abuse." (*Id.* at p. 175-176). As part of the treatment plan, she referred the victim to trauma-focused counseling.

{¶17} In May of 2024, the victim was residing with Curry, D.T. (the victim's brother), and Appellant at 56 Bissell in Youngstown, Ohio. The victim described his encounter with officers at the Southern Park Mall on May 8, 2024. The victim testified that he ran from officers because he did not want to go home due to the fighting between Appellant and Curry. The victim indicated that the officers eventually caught him and returned him to Curry's care. Upon returning home, the victim stayed for about five

minutes before leaving for the store. He ultimately ended up at the complex where his grandmother lived. A security guard intercepted the victim and held him until the YPD arrived. Despite the victim's resistance, the officers returned him to his home and to the care of Curry. Although the victim attempted to evade the security guard and the officers, he denied sustaining any injuries during these interactions.

{¶18} Upon arriving home, the victim went into the house and climbed out of the second floor bathroom window onto the roof. The police were still present when he got on the roof and Appellant was yelling for him to come into the house. Once the officers left the scene, Appellant grabbed the victim by the arm and pulled him into the house through the window. The victim was placed in his bedroom. Shortly thereafter, the victim stated Appellant entered his bedroom and repeatedly hit him with an object, describing the pain he felt:

> Q: Okay. Do you know about how many times you were hit; do you remember that?
>
> A: I remember a lot of times.
>
> Q: A lot of times. Okay. How did that feel when you were being hit?
>
> A: It would just hurt a lot.
>
> Q: It hurt. Can you describe that pain?
>
> A: Like my back was hurting. My arm was hurting. My leg was hurting.
>
> Q: Did it sting?
>
> A: Yes.
>
> Q: Did it burn?
>
> A: Yes.
>
> Q: Were you in pain the rest of the night?

A: Yes.

Q: How long did the pain last?

A: Like until I went to bed.

Q: Until you went to bed. Did it hurt at all the next day?

A: No.

(*Id.* at p. 108-109).

{¶19} The victim further testified that his bodily injuries were caused by Appellant and he showed his back to the trial judge during the bench trial.

{¶20} D.T. described the relationship between Appellant and Curry as abusive and further testified that they frequently consumed alcohol. On May 9, 2024, D.T. indicated he was in his bedroom when he heard the victim yelling, screaming, and crying in pain. D.T. also overheard Curry tell Appellant to "[h]it [the victim] a few more times." (*Id.* at p. 134).

{¶21} Intake Supervisor Kutch testified that Children Services received a physical abuse referral for the victim on May 9, 2024. At the time of this referral, Children Services had an open case relative to another child of Curry's so Children Services had familiarity with this family. Because this was an abuse referral, the intake supervisor and the assigned intake caseworker responded immediately to East Middle School, at which time they learned the victim was transferred to the hospital. The intake supervisor and the intake caseworker met the victim at the hospital and observed his injuries. Specifically, the intake supervisor noted looped cuts, some of which were open wounds, and bruises to the victim's back, neck, and shoulders. Based upon her experience, the intake supervisor testified these injuries were consistent with "physical abuse," not appropriate discipline. (*Id.* at p. 151). Because of the physical abuse, the victim and D.T. were immediately removed from Curry's care pursuant to an out of home safety plan. The children were placed with their maternal grandfather, with eventual placement in foster care. Children Services entered two dispositions in this case: (1) substantiated neglect for Curry; and (2) substantiated abuse for Appellant. The intake supervisor testified that since his foster placement, the victim has not run away from his foster home.

Case No. 25 MA 0052

{¶22} On May 10, 2024, Detective Short was assigned to investigate the physical abuse of the victim. The detective had prior involvement with this family so she was familiar with the victim. Overall, the detective had 10 to 12 runaway reports involving Curry's children. The detective indicated that children run away for many reasons, including abuse and neglect.

{¶23} As part of the criminal investigation, Detective Short scheduled Appellant and Curry for recorded interviews at the police department. Both attended the interviews. The detective read Appellant and Curry their Miranda rights and both agreed to provide a recorded statement.

{¶24} Curry provided the following information in her recorded statement: (1) the victim ran away and returned home the night before the incident; (2) shortly after returning home, the victim ran away again, and the YPD officers returned the victim home around 1:00 a.m. on May 9, 2024; (3) upon returning home, the victim went out the bathroom window and was lying on the roof; (4) the victim was eventually brought into the house, at which point he received a "whooping"; (5) Curry was present for the "whooping"; (6) Curry reported that Appellant "whooped" the victim with his hand; (7) Curry told Appellant to "whoop" the victim; (8) the victim was not injured when the YPD brought him home; and (9) the victim went to bed after the "whooping" and went to school in the morning. *See* (State's Exhibit 33).

{¶25} Appellant provided the following information in his recorded statement: (1) after the victim came into the house from the roof, Appellant and Curry directed him to take a shower; (2) after the victim came out of the shower, Appellant "whooped" him with an open hand; and (3) Curry was present for the "whooping" and instructed Appellant to "whoop" the victim. *See Id.*

{¶26} In furtherance of the criminal investigation, Detective Short reviewed the photographs of the victim's injuries taken at the hospital. Based upon her experience and training, the detective testified that the victim's injuries were not caused by an open hand. Rather, the detective indicated the injuries were caused by someone hitting the victim with an object that would create a loop pattern, such as a belt or extension cord.

{¶27} At the conclusion of the State's case, Appellant's defense counsel moved for an acquittal pursuant to Crim.R. 29 which was overruled by the trial court. The defense rested without presenting evidence.

{¶28} The trial court found Appellant guilty on counts two (felonious assault), three (endangering children), and four (endangering children) as contained in the indictment.

{¶29} The trial court's May 15, 2025 sentencing entry incorrectly states that Appellant pled guilty to the three charges. The court subsequently filed a nunc pro tunc sentencing entry on September 23, 2025 correcting the clerical error and stating that Appellant was found guilty of the three charges following a bench trial. Specifically, the court stated:

> The Court finds that Counts Three and Four merge with Count Two for purposes of sentencing, and the Court proceeded to sentence the Defendant on Count Two.

> It is hereby ORDERED that Defendant serve a prison term of a minimum of FOUR (4) YEARS and a maximum term of SIX (6) YEARS.

> In addition, as part of this sentence, post release control is mandatory for a maximum term of up to three (3) years but not less than eighteen (18) months.

(9/23/2025 Amended Judgment Entry, p. 1-2).

{¶30} Appellant filed this appeal and raises three assignments of error.

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY OF FELONIOUS ASSAULT AFTER MAKING A FINDING APPELLANT ACTED RECKLESSLY.**

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF CHILD ENDANGERING UNDER R.C. 2919.22(B)(3), BECAUSE THE STATE**

**FAILED TO PROVE THE DISCIPLINE CREATED A SUBSTANTIAL RISK OF SERIOUS PHYSICAL HARM.**

**ASSIGNMENT OF ERROR NO. 3**

**THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF CHILD ENDANGERING UNDER R.C. 2919.22(B)(1), WHERE THE COURT EXPRESSLY FOUND THAT THE CONDUCT WAS CORPORAL PUNISHMENT, NOT ABUSE.**

{¶31} In his first assignment of error, Appellant argues his conviction for felonious assault under R.C. 2903.11(A)(1) is insufficient and void because the trial court stated it considered his actions to be reckless.

{¶32} In his second assignment of error, Appellant contends his conviction for endangering children under R.C. 2919.22(B)(3) is insufficient and void because the State failed to prove the discipline created a substantial risk of serious physical harm.

{¶33} In his third assignment of error, Appellant alleges his conviction for endangering children under R.C. 2919.22(B)(1) is insufficient and void because the trial court stated it considered his actions to be corporal punishment, not abuse.

{¶34} Because Appellant's three assignments of error all challenge the sufficiency of the evidence, we will consider them together.

> "When a court reviews a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*State v. T.D.J.*, 2018-Ohio-2766, ¶ 46 (7th Dist.).

{¶35} "'[C]ircumstantial evidence and direct evidence inherently possess the same probative value.'" *State v. Biros*, 78 Ohio St.3d 426, 447 (1997), quoting *Jenks* at paragraph one of the syllabus.

{¶36} For the reasons addressed below, we determine the judgment is supported by sufficient evidence.

{¶37} Regarding his first assignment of error, Appellant takes issue with the guilty finding for felonious assault under R.C. 2903.11(A)(1) (count two) which states in part: "(A) No person shall knowingly . . . (1) [c]ause serious physical harm to another or to another's unborn[.]"

{¶38} The term "knowingly" is defined in R.C. 2901.22(B) as follows: "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."

{¶39} R.C. 2901.01, "Definitions," states in part:

(A) As used in the Revised Code:

. . .

(5) "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(a)-(e).

**{¶40}** Appellant alleges the trial judge, by using the term reckless in his analysis of serious physical harm and corporal punishment, erred in applying the incorrect mens rea in convicting him of felonious assault. Appellant did not object to the judge's remarks below.

**{¶41}** Failure to raise specific errors at the trial court level forfeits all such errors on appeal except for plain error. *State v. Evans*, 2023-Ohio-2373, ¶ 18 (7th Dist.), citing *State v. Zuern*, 32 Ohio St.3d 56, 63 (1987); Crim.R. 52(B).

> A three-part test is employed to determine whether plain error exists. *State v. Billman*, 7th Dist. Monroe Nos. 12 MO 3, 12 MO 5, 2013-Ohio-5774, ¶ 25, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).
>
> First, there must be an error, i.e. a deviation from a legal rule. Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. Third, the error must have affected "substantial rights."
>
> *Billman* at ¶ 25. In order to demonstrate that a defendant's substantial rights have been affected he must show that, but for the error, the trial outcome would have been different. *State v. Issa*, 93 Ohio St.3d 49, 56, 752 N.E.2d 904 (2001).
>
> Plain error "is a wholly discretionary doctrine whereby the appellate court may, but need not, take notice of errors which are obvious and which affect substantial rights that are outcome determinative. . . .This elective tool is to be used with the utmost of care by the appellate court in only the most exceptional circumstances where it is necessary to avoid a manifest miscarriage of justice." (Internal citations omitted.) *State v. Jones*, 7th Dist. No. 06 MA 109, 2008-Ohio-1541, ¶ 65.
>
> *State v. Williamson*, 2021-Ohio-3328, ¶ 37-38 (7th Dist.).

*State v. Levesque*, 2025-Ohio-2834, ¶ 15 (7th Dist.).

{¶42} Specifically, Appellant takes issue with the following statement by the trial court judge: "the use of an object to repeatedly strike a 13 year old . . . was, in this Court's opinion, reckless, it violated and created a substantial risk of serious physical harm, disregarding the unjustifiable risks associated with striking a 13-year-old boy repeatedly with some object." (3/24/2025 Bench Trial Tr., p. 243).

{¶43} We must view the trial judge's use of the term reckless in the full context of his analysis of serious physical harm and corporal punishment, rather than in isolation as Appellant suggests. *See, e.g., State v. Thompson*, 33 Ohio St.3d 1, 12-13 (1987).

{¶44} This case was tried to the bench before an experienced trial judge. In rendering the guilty verdicts against Appellant and his co-defendant, Curry, the judge outlined his analysis of serious physical harm and corporal punishment. Included in his soliloquy was the judge's affirmation that, in reaching the guilty verdicts, he "considered, as I do instruct jurors, the evidence as to each count separately, and as to both defendants separately." (3/24/2025 Bench Trial Tr., p. 241). He went on to state that two primary issues were "intertwined" in this case. (*Id.*) "[T]he first issue is, of course, the issue of corporal punishment. And the second is as to one of the essential elements in some of the counts. And that is what is serious physical harm." (*Id.*)

{¶45} While serious physical harm is an element of felonious assault and endangering children, corporal punishment is only an element of endangering children for which the mens rea is recklessness, as opposed to felonious assault which requires the defendant to knowingly cause serious physical harm. *See generally State v. Dawson*, 2017-Ohio-2957, ¶ 25 (7th Dist.); R.C. 2903.11(A)(1). After considering the evidence and testimony from the State's ten witnesses, the trial judge found that the State "has proven beyond a reasonable doubt each and every element of the offense of felonious assault as to [Appellant] . . . and returns a verdict of guilty." (*Id.* at p. 246).

{¶46} In viewing the trial judge's use of the term reckless in the full context of his analysis of serious physical harm and corporal punishment, he properly determined, based upon the evidence in the record, that the State proved each and every element of felonious assault. Thus, Appellant fails to prove the judge's use of the term reckless in his analysis of serious physical harm and corporal punishment was plain error.

**{¶47}** As addressed, the State's witnesses collectively established that Appellant "knowingly . . . [c]ause[d] serious physical harm" to the victim, his girlfriend's minor child. R.C. 2903.11(A)(1), "Felonious assault." The victim testified that Appellant repeatedly hit him with an object and described the pain he felt as a result. Medical professionals determined the victim was hit with an object. The victim received physical injuries causing him "significant pain" and likely to result in permanent scarring. (3/24/2025 Bench Trial Tr., p. 84, 182). The victim's injuries were "[h]ighly concerning and consistent with child physical abuse," not appropriate discipline. (*Id.* at p. 151, 175-176). Even Appellant, in his recorded statement, indicated he "whooped" the victim. *See* (State's Exhibit 33).

**{¶48}** Upon consideration, Appellant's conviction for felonious assault under R.C. 2903.11(A)(1) is based on sufficient evidence.

**{¶49}** Regarding his second and third assignments of error, Appellant also takes issue with the guilty findings for endangering children under R.C. 2919.22(B)(1) (count three) and 2919.22(B)(3) (count four) which state:

> (B) No person shall do any of the following to a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age:

> (1) Abuse the child;

> . . .

> (3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child[.]

R.C. 2919.22(B)(1) and (3).

**{¶50}** In this case, the State also presented sufficient evidence establishing Appellant committed the charged offenses of endangering children under R.C. 2919.22(B)(1) and (3), demonstrating he abused and administered unreasonable and excessive corporal punishment to the victim causing serious physical harm.

Case No. 25 MA 0052

{¶51} While Ohio law recognizes a parent's right to administer reasonable corporal punishment to his child, it prohibits any person from abusing or administering excessive corporal punishment in disciplining a child. *State v. Suchomski*, 58 Ohio St.3d 74, 75 (1991); R.C. 2919.22(B)(1) and (3). Any person that abuses or administers unreasonable or excessive corporal punishment to a child that results in serious physical harm commits an act of endangering children. R.C. 2919.22(B)(1) and (3).

> In evaluating the reasonableness of parental discipline, the totality of the circumstances are to be considered, including factors such as: the age of the child; the child's behavior leading up to the discipline; the child's response to prior non-corporal punishment; the location of the injury; the severity of the punishment; and the parent's state of mind while administering the punishment.

*State v. Triplett*, 2018-Ohio-5405, ¶ 29 (7th Dist.), citing *State v. Rosa*, 2013-Ohio-5867, ¶ 35, 41 (7th Dist.), abrogated on other grounds, *State v. Faggs*, 2020-Ohio-523; *see also State v. Krull*, 2003-Ohio-4611 (12th Dist.) (the defendant was convicted of endangering children which involved his girlfriend's minor child).

{¶52} In accordance with R.C. 2929.22(B)(1), the State presented the testimony of Dr. Sarkis, Nurse Practitioner McAllen, and Intake Supervisor Kutch establishing that the 13-year-old victim was abused by Appellant.

{¶53} As stated, Dr. Sarkis testified that, based upon the history provided by the victim and her observations of his wounds, the injuries sustained by the victim were concerning for physical abuse. Nurse Practitioner McAllen testified that, based upon her training and experience, the victim's injuries were highly concerning for physical abuse and not consistent with reasonable physical discipline. Intake Supervisor Kutch testified the victim's injuries were consistent with physical abuse and that Children Services substantiated physical abuse as to Appellant.

{¶54} In accordance with R.C. 2929.22(B)(3), in applying the foregoing factors in *Triplett*, the State presented sufficient evidence in the form of testimony, photographs, and observations of the victim's back, establishing that the corporal punishment Appellant

administered to the victim was unreasonable and excessive and that Appellant caused the victim serious physical harm. *See* R.C. 2901.01(A)(5)(a)-(e).

{¶55} As stated, on the day at issue, the victim had run away from home and returned later that evening accompanied by law enforcement. Almost immediately after, the victim went onto the roof and for over 45 minutes refused to come inside. While law enforcement was still present at the scene, Appellant was overheard yelling and swearing at the victim. The victim had a history of running away and did not want to return home because Appellant and Curry would fight all the time. D.T. also testified that Appellant and Curry drank a lot and had an abusive relationship.

{¶56} After law enforcement cleared the scene, Appellant grabbed the victim by the arm and pulled him off the roof through the bathroom window. Shortly thereafter, Appellant entered the victim's bedroom and repeatedly hit him with an object that caused looped pattern open and closed wounds to his back and arms which necessitated medical treatment and resulted in pain and scarring. The victim testified that he experienced significant pain to his back, legs, and arms. D.T. testified that he heard the victim yelling, screaming, and crying in pain.

{¶57} Multiple professionals testified to the nature and extent of the injuries sustained by the victim as a result of Appellant's physical abuse. Nurse Thomas testified she observed open and closed wounds on the victim's back, under his arms, and down his arms. She further stated the wounds "[l]ooked like open flesh, like whipped" and "the worst [she] had seen." (3/24/2025 Bench Trial Tr., p. 50, 52). To prevent infection, the nurse provided medical treatment to the victim by cleansing and applying triple antibiotic ointment and gauze to his wounds. To address his soreness, the nurse provided the victim with ice packs. Similarly, Officer Moran described the victim's injuries as welts, contusions, and maybe an abrasion with closed loop patterns to his back, neckline, shoulder, and arm. Due to the extent of the victim's injuries, he required further medical care and was transported from school to the hospital emergency department. Intake Supervisor Kutch also observed looped pattern cuts and bruises on the victim's neck, back, and shoulders. The intake supervisor testified that the victim's injuries were consistent with physical abuse, not appropriate physical discipline. The intake supervisor

further indicated that appropriate discipline is administered without an object to non-sensitive areas, such as the buttocks, and does not result in marks or bruising.

{¶58} Dr. Sarkis described the injuries sustained by the victim as follows: different patterns of bruising and scabs on the victim's right arm; looped bruising with a scab on the victim's underarm; bruising with loops on the victim's back; patterned bruising with a scab/laceration on the victim's shoulder or underarm; and bruising with linear injury to the left arm, that were caused by someone hitting the victim with an object. The victim would have experienced significant pain as a result of the injuries which could result in permanent scarring. Based upon her medical evaluation of the victim, Dr. Sarkis determined his injuries were concerning for physical abuse.

{¶59} Nurse Practitioner McAllen completed a head to toe physical exam of the victim at the Child Advocacy Center over 21 days after the beating, during which she observed several looped pattern scars on his back and the back of his arms. The scars were consistent with the injuries documented in the victim's medical record from his emergency room visit. Due to the looped pattern of the scars, the nurse practitioner determined the victim's injuries were caused by Appellant hitting him with an object, which is not an appropriate form of physical discipline. The nurse practitioner further testified that the American Academy of Pediatrics established guidelines for appropriate physical discipline and defined it "as anything that does not leave a transient -- meaning superficial redness that last longer than a couple of minutes." (*Id.* at p. 174). The nurse practitioner revealed the injuries caused the victim significant pain and were likely to cause permanent scarring. The nurse practitioner, based upon her training and experience, found the victim's injuries were highly concerning for and consistent with physical abuse.

{¶60} Detective Short testified she reviewed the photographs of the victim's injuries, and based upon her experience, she concluded that these injuries were caused by someone hitting the victim with an object that would create a loop pattern, such as a belt or extension cord. In their recorded statements, both Appellant and Curry admitted that Appellant hit the victim multiple times after he was pulled into the house from the roof.

{¶61} Nurse Practitioner McAllen further testified she has experience with runaways, and that children often run away out of fear resulting from maltreatment.

Detective Short stated she has received 10 to 12 runaway reports for Curry's children. She further testified that children run away for many reasons, including abuse and neglect. The victim, after being placed in foster care, never ran away from his foster home.

{¶62} Synonymous with these findings, the trial judge observed the victim's bare back during the bench trial and noted visible scars, over ten months after the offense occurred. Thus, the judge not only heard testimony from multiple witnesses who detailed the injuries sustained by the victim, but he also had the opportunity to view the photographs of the victim's injuries and personally observed the visible scars that remained on the victim's back almost one year after the beating.

{¶63} Pursuant to *Jenks,* 61 Ohio St.3d 259, there is sufficient evidence upon which the trier of fact could reasonably conclude beyond a reasonable doubt that the elements of felonious assault and endangering children were proven. Thus, the trial court did not err in overruling Appellant's Crim.R. 29 motion.

{¶64} Appellant's first, second, and third assignments of error are without merit.

## CONCLUSION

{¶65} For the foregoing reasons, Appellant's assignments of error are not well-taken. The May 15, 2025 judgment and the September 23, 2025 nunc pro tunc judgment of the Mahoning County Court of Common Pleas convicting Appellant for felonious assault and endangering children and sentencing him to prison following a bench trial are affirmed.

Robb, P. J., concurs.

Hanni, J., concurs.

Case No. 25 MA 0052

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgments of the Court of Common Pleas of Mahoning County, Ohio, are affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**